758 P.2d 1326

**Joseph A. WARFEL, a single person, Plaintiff–Appellant,**

**v.**

**Becky L. CHENEY, a single person, and H. Edwin Cheney and Estelle Cheney, husband and wife, Defendants–Appellees.**

**No. 1 CA–CIV 9449.**

Court of Appeals of Arizona, Division 1, Department C.

June 23, 1988.

Mandate Issued July 26, 1988.

Jacoby & Meyers Law Offices by Mitchell Jay Klein, Phoenix, for plaintiff-appellant.

O'Connor, Cavanaugh, Anderson, Westover, Killingsworth & Beshears by Frank M. Fox, Scott E. Boehm, Phoenix, for defendants-appellees.

## OPINION

CORCORAN, Judge.

Plaintiff-appellant Joseph A. Warfel (plaintiff) was injured when a car driven by defendant-appellee Becky L. Cheney (defendant) rear-ended plaintiff's motorcycle while he was stopped at a red light.

Plaintiff sued defendant, seeking compensatory and punitive damages. Defendant admitted her negligence in causing the accident and the case proceeded to jury trial to determine damages. The jury was instructed that it could reduce damages if plaintiff's failure to wear a helmet was a failure to exercise ordinary care for his safety and if this failure caused any portion of his injuries. The punitive damages issue was not sent to the jury. The jury returned a general verdict for plaintiff of $25,000.00 for compensatory damages, and the trial court entered judgment for that amount. The jury was given only one form of verdict, which did not indicate the total damages incurred by plaintiff or the amount the jury subtracted for damages attributable to plaintiff's failure to wear a helmet. Plaintiff moved for new trial, which the court denied.

Plaintiff appeals from the denial of his motion for new trial, arguing that he was wrongfully thwarted in his attempt to establish for the jury the damages to which he should be entitled because of two improper evidentiary rulings. First, plaintiff argues that the trial court committed prejudicial error by admitting evidence that plaintiff was not wearing a helmet. Second, plaintiff contends that the court erred by excluding evidence of defendant's conduct after the accident, from which plaintiff claims he would have been able to establish a right to punitive damages.

### 1. *Plaintiff's Failure to Wear a Helmet*

We first address the issue whether the trial court erred in admitting evidence that plaintiff was not wearing a helmet, thus allowing the jury to consider this evidence in determining whether plaintiff's damages should be reduced. Plaintiff filed a pretrial motion *in limine* to exclude any testimony about his failure to wear a helmet. Plaintiff acknowledged that this court had recently ruled that a defendant may introduce evidence of a plaintiff's failure to use an available *seat belt* if a defendant is able to demonstrate a causal relationship be-

tween the nonuse of the seat belt and injuries a plaintiff may have suffered; if defendant does, the jury may reduce plaintiff's damages accordingly. *See Law v. Superior Court,* 157 Ariz. 142, 755 P.2d 1130 (Ct.App.1986) (*Law I*).[1]

Plaintiff argued, however, that the court should not expand the holding in *Law I* regarding seat belts to conclude that evidence of plaintiff's failure to wear a helmet would be relevant. Additionally, plaintiff argued that the evidence defendant would attempt to use would be too speculative to be admissible.

In ruling on the motion, the trial court determined that, because of the decision in *Law I*, testimony regarding plaintiff's failure to wear a safety helmet would be relevant to the issue of damages under comparative negligence principles. The trial court precluded the defense, however, until the court was apprised of what the defense witnesses would say.

On the second day of trial, counsel for plaintiff and defendant met with the trial judge. Defense counsel wanted to persuade the court that Fred Christensen, M.D., who had treated plaintiff after the accident, could provide evidence to link helmet nonuse with enhancement of plaintiff's injuries. During his *voir dire* examination, Dr. Christensen told the court, out of the presence of the jury, that based on his treatment of approximately 1,000 persons injured in motorcycle accidents, some wearing helmets and some not, that helmet use generally results in less severe head injuries after motorcycle accidents. He indicated he would not be able to state with medical probability what the difference in plaintiff's injuries would be but that it was more than likely that some of plaintiff's injuries were greater due to his helmet nonuse. Plaintiff's counsel objected to Dr. Christensen's testimony, arguing improper foundation and that it was too speculative. The trial court, however, allowed Dr. Chris-

tensen to testify. Thereafter, Dr. Christensen testified before the jury as follows:

Q [FRANK M. FOX, ESQ., COUNSEL FOR DEFENDANTS] Doctor, have you ever before treated persons involved in motorcycle accidents?

A [DR. CHRISTENSEN] Yes.

Q On how many occasions?

A Many occasions. In excess of 1,000.

Q In this case, Doctor, Mr. Warfel's major injury was right here on the forehead; isn't that correct?

A Yes.

Q And that would normally be where a motorcycle helmet would cover; isn't that correct?

A Yes.

Q Now, Doctor, I know you can't say with certainty that Mr. Warfel would not have injured his head would he have worn a helmet, but can you state more likely than not that his injury to his head would not be so severe had he been wearing a helmet?

MR. KLEIN: Objection, improper foundation.

THE COURT: Overruled.

THE WITNESS: I believe his head injury would not have been as severe had he been wearing a helmet.

■ On appeal, plaintiff argues that this court should conclude that evidence of helmet nonuse should never be admissible to reduce damages a plaintiff suffered as a result of a defendant's negligence. He points out that most states that have considered whether to allow evidence of helmet nonuse have excluded the evidence. He argues that admitting this evidence runs counter to the traditional ideas that a negligent party takes plaintiffs as they find them and that a plaintiff should not be required to mitigate damages before they occur. Additionally, he argues that, even if admissible in a proper case, this evidence

---

**1.** Before *Law I,* evidence of failure to use a seat belt had not been admissible in Arizona pursuant to Division Two's holding in *Nash v. Kamrath,* 21 Ariz.App. 530, 521 P.2d 161 (1974). In *Law I,* this court concluded that the reasoning in *Nash* for excluding evidence of failure to use a seat belt no longer applied after enactment in 1984 of the Uniform Contribution Among Tortfeasors Act, which transformed Arizona from a contributory negligence state to a comparative negligence state. *See* A.R.S. §§ 12–2501 to –2509.

should not have been allowed in this particular case because Dr. Christensen's testimony, presented to establish the causal link between helmet nonuse and injuries, lacked proper foundation and was too speculative.

After trial in this case, the Arizona Supreme Court accepted review of *Law I;* we now have the benefit of the supreme court's decision to aid us in answering the questions plaintiff raises in this appeal. *See Law v. Superior Court,* 157 Ariz. 147, 755 P.2d 1135 (1988) (*Law II*).

*Law II* carefully limited the circumstances under which the evidence of *seat belt* nonuse would be admissible and limited the issue to which it would relate. The court concluded that under comparative negligence principles, the plaintiff's failure to use a seat belt that is available in his car is relevant to whether the plaintiff acted reasonably to minimize foreseeable injury and damages, provided that evidence shows the injury would not have occurred or would have been mitigated had the seat belt been used, and provided that evidence establishes the degree of enhancement of the injury because of the nonuse. *Law II,* at 157, 755 P.2d at 1145.

A. *Applicability of Law II to Helmet Nonuse.* Our first determination must be whether the principles enunciated in *Law II* in the context of automobile seat belts apply similarly to motorcycle helmets.

In recognizing seat belts as a "safety device," *Law II* first concluded:

[I]n almost every instance seat belt-induced injuries are far less drastic than those that would have been incurred without the seat belt use. As a general rule, a motorist is simply better off wearing a seat belt. We conclude from the technological data that continued nonrecognition of the seat belt defense cannot be based on the general concept that seat belts cause harm. The opposite is generally true.

*Law II,* at 153, 755 P.2d at 1141.

Here too, we start with the accepted premise that motorcycle helmets generally save lives and prevent enhancement of head injuries. Government statistical studies show that helmetless motorcycle riders have more than twice the head injury rate and almost six times the fatal head injury rate of helmeted riders. A. Berkowitz, *The Effect of Motorcycle Helmet Usage on Head Injuries, and the Effect of Usage Laws on Helmet Wearing Rates,* U.S. Dep't of Transp., Nat'l Highway Traffic Safety Admin. (DOT–HS–805–851, March 1981). Furthermore, the statistical relationship of helmetless riders to increasing fatalities has been well documented in those states that have repealed their helmet laws. *See* United States Dep't of Transp., Nat'l Highway Traffic Safety Admin., *A Report to the Congress on the Effect of Motorcycle Helmet Use Law Repeal—A Case for Helmet Use* (DOT–HS–805–312, April 1980).

Those opposed to laws requiring helmet use have generally attacked the safety of helmets on three grounds:

1. that helmets can themselves cause the neck and spinal injuries found in injured, helmeted cyclists;

2. that helmets dangerously restrict a rider's peripheral vision; and

3. that helmets dangerously reduce a cyclist's hearing.

Note, *Helmetless Motorcyclists—Easy Riders Facing Hard Facts: The Rise of the "Motorcycle Helmet Defense,"* 41 Ohio St.L.J. 233, 236 n. 25 (1980) (hereafter *Helmetless Motorcyclists*). However, when data from several studies were pooled, it was concluded that use of a safety helmet had no adverse effect on the rate of neck injuries, and actually reduced the rate slightly; furthermore, of 980 neck injuries, only 4 were attributed to the helmet use, and those 4 were minor injuries. Hurt, *Status Report of Accident Investigation Data Motorcycle Accident Cause Factors and Identification of Countermeasures,* Univ. of S.Cal., Traffic Safety Center (DOT–HS–5–01160 Jan. 1979). Similarly, several studies of the limitations imposed on the driver's vision by a helmet concluded that full coverage helmets restrict a driver's field of view by less than 3%, providing a horizontal field of view of more than 180°, which is greater than the 140° requirement in state licensing vision tests,

and therefore not significantly impairing peripheral vision. Gordon & Price, *Technical Report on the Field of View With and Without Motorcycle Helmets*, United States Dep't of Transp., Nat'l Traffic Safety Admin. (DOT–HS–801–758 Sept. 1975). A third government report concluded that because helmets equally reduce both the loudness of safety signals (such as horns and sirens) and motorcycle noise, they do not change the "signal-to-noise ratio" between the two sounds and, therefore, do not affect a helmeted driver's ability to respond to safety signals. Henderson, *Technical Note on the Effect of Safety Helmets on Auditory Capability*, United States Dep't of Transp., Nat'l Traffic Safety Admin. (DOT–HS–801–759, Sept. 1975).

We thus begin by taking judicial recognition of the motorcycle helmet as a "safety device" that generally reduces risk of death and significant head injury in the event of a traffic accident. The principles set forth in *Law II* regarding seat belts as safety devices thus apply similarly to motorcycle helmets.

In reaching the conclusion that evidence of seat belt nonuse was admissible, the court in *Law II* rejected the notion that a plaintiff has no responsibility to guard against the dangers of motor vehicle accidents by anticipating the negligence of others. *Law II*, at 153–154, 755 P.2d at 1141–1142. The court concluded that the issue was not whether a person has a duty to wear a seat belt; instead, the issue was whether the plaintiff had taken reasonable steps to minimize foreseeable injury and damages. Under comparative negligence principles, this doctrine that traditionally applied to post-accident conduct applied to pre-accident conduct as well. *Law II*, at 154, 755 P.2d at 1142.

Plaintiff points out that the majority of cases that have ruled on the "helmet defense" have held it inadmissible. *See, e.g., Dare v. Sobule*, 674 P.2d 960 (Colo.1984); *Hukill v. DiGregorio*, 136 Ill.App.3d 1066, 92 Ill.Dec. 64, 484 N.E.2d 795 (1985); *Bond v. Jack*, 387 So.2d 613 (La.App.1980), *aff'd sub nom. Bond v. Commercial Union Assur. Co.*, 407 So.2d 401 (La.1981); *Rogers*

*v. Frush*, 257 Md. 233, 262 A.2d 549 (1970); *Burgstahler v. Fox*, 290 Minn. 495, 186 N.W.2d 182 (1971). These cases are of little value to us because the rationale given in each either has been expressly rejected by our supreme court in *Law II* or has no application because of differences in the negligence law of those states.

We find three opinions that have admitted evidence of a plaintiff's helmet nonuse. In New York, the trial court found the evidence admissible solely on the basis that New York law requires motorcyclists to wear helmets. *Dean v. Holland*, 76 Misc.2d 517, 350 N.Y.S.2d 859 (1973). That court does not discuss whether it would have found the evidence admissible even in the absence of such a statute.

In a second case, the Minnesota Court of Appeals allowed a jury instruction that plaintiff's failure to wear a helmet could be considered on the issue of damages for head injuries because the instruction was not objected to, was based on a statute allowing such evidence, and was supported by the evidence. *Northway v. Madsen*, 390 N.W.2d 435 (Minn.App.1986). These circumstances are not similar to those in our present case.

A more helpful case is *Halvorson v. Voeller*, 336 N.W.2d 118 (N.D.1983). In admitting evidence of helmet nonuse, the North Dakota court rejected many of the same arguments our supreme court rejected in *Law II* in dismissing the notion that evidence of seat belt nonuse was irrelevant. In sum, we find that most of the reasons given in *Law II* for finding evidence of seat belt nonuse relevant are equally applicable for finding evidence of helmet nonuse relevant.

B. *Relevance of Legislative Action.* After the passage of the Highway Safety Act of 1966, 23 U.S.C. §§ 401–04, the federal government issued a highway safety standard encouraging states to enact mandatory motorcycle helmet use laws. *See* 33 F.R. 16337 (Nov. 7, 1968), currently codified at 23 C.F.R. § 1204.4 (1979). If a state failed to comply, federal highway funds could be withheld. As a result of this legislation, by 1975 all but three states had

enacted mandatory helmet use laws. *See* Hartunian, Smart, Willemain & Zador, *The Economics of Safety Deregulation: Lives and Dollars Lost Due to Repeal of Motorcycle Helmet Laws*, 8 J. Health, Politics, Policy & Law 76 (1983) (hereafter Hartunian). Effective January 1, 1969, Arizona's motorcycle law required that all operators and passengers of motorcycles wear "a protective helmet safely secured." *See* Laws 1968, ch. 168, § 5 (codified at A:R.S. § 28–964). Additionally, the Arizona Highway Commission adopted regulations including specifications for protective headgear. *See* A.C.R.R. R17–4–39 (renumbered without change as R17–4–706 (Supp. 87–2)).

In 1976, when the United States Department of Transportation (DOT) attempted to financially penalize those states that had not enacted helmet laws, Congress reacted to pressure from state opponents of the mandatory helmet laws by revoking DOT's authority to withhold funds. Highway Safety Act of 1976, Pub.L. No. 94–280, tit. II, 90 stat. 451 (1976). Twenty-eight states quickly repealed their helmet laws, or amended them to apply only to motorcycle riders younger than 18, in response to the pressure from motorcycle enthusiasts for "freedom of choice." *See Helmetless Motorcyclists* at 238–39 & n. 39–43. Effective May 27, 1976, Arizona's mandatory motorcycle helmet law was amended to apply only to an operator or passenger "who is under eighteen years of age." Laws 1976, ch. 57, § 2 (codified as amended at A.R.S. § 28–964). Thus, Arizona has no current statutory requirement that an adult rider wear a motorcycle helmet.

In *Law II*, our supreme court concluded that adoption of the "seat belt defense" was not precluded by the absence of a statute requiring adults to wear seat belts. 157 Ariz. at 155, 755 P.2d at 1143. Furthermore, the court reasoned that the legislature's action in requiring use of seat restraint systems for children under 4 years of age, *see* A.R.S. § 28–907, did not forbid a defendant from showing that an adult plaintiff's unreasonable failure to use a seat belt enhanced injuries. The court stated:

Allowing the jury to assess damages by considering an adult's failure to use seat belts does not conflict with the seat belt statute and does conform to our statutory comparative negligence scheme. We are furthering the statutory objectives in this area, not contradicting them.

. . . .

... To hold that we cannot let a jury consider such conduct on the issue of damages is to judicially translate legislative nonaction on a common law damage issue into legislative intent to approve nonuse of seat belts. Such a conclusion has never been expressed by the legislature and is very far from the demonstrated legislative objectives in this area.

At 155–156, 755 P.2d at 1143–1144.

Here, plaintiff argued at oral argument that the legislature's "repeal" of the motorcycle helmet law for adults is distinguishable from the legislative "inaction" regarding seat belts, and that this court should be precluded from adopting a "motorcycle helmet defense" on that basis. We reject this argument as unsound.

In enacting a statute requiring persons under 18 to wear motorcycle helmets, the legislature obviously concluded that helmets reduce injuries. In 1969, when the statute also applied to adults, this court found that the statute's primary purpose was "to prevent injury to motorcyclists from cranial trauma." *State v. Also*, 11 Ariz.App. 227, 229, 463 P.2d 122, 124 (1969). The determination that helmets reduce injuries is not negated by the absence of a current requirement that persons 18 and older wear helmets. We do not interpret the legislature's amendment to reflect a conclusion that helmets do *not* protect riders over 18; rather, the trend to repeal mandatory helmet laws throughout the nation was based on the conclusion that an adult should be allowed to make a personal decision whether to wear protective headgear. *See generally Helmetless Motorcyclists* at 238; *e.g., Halvorson v. Voeller*, 336 N.W.2d at 122 n. 3.

Our holding that evidence of helmet nonuse is relevant to the issue whether a plaintiff could have avoided injuries and wheth-

er damages should be reduced accordingly does not lessen the free choice of a motorcyclist to use or not use a helmet. An adult may still, under existing law, freely decide not to wear a helmet. However, a helmetless rider who is injured and brings an action to recover in tort must bear the consequence of the free choice not to wear a helmet by reduction of damages in the amount the jury determines the helmet would have reduced the injuries. We agree with the reasoning of the North Dakota Supreme Court:

> Just as there is no absolute duty, with respect to persons 18 and over, to wear helmets, even in mitigation of damages, there is no absolute guarantee that nonuse of a helmet never can be found to be unreasonable.

*Halvorson*, 336 N.W.2d at 123. We thus conclude that the legislature's amendment of the helmet laws does not conflict with our holding that evidence of helmet nonuse may be admissible to show that a plaintiff could have reduced injuries.

C. *Degree of Enhancement of Injury.* Although the evidence of helmet nonuse is relevant to the issue of damages, defendants must also produce evidence showing what portion of the injuries sustained by plaintiff was attributable to helmet nonuse. In *Law II*, our supreme court ruled that a jury may consider nonuse of a seat belt in reducing damages only "[w]here nonuse either causes injuries which would not have occurred had the restraint been used or enhances those injuries that did occur" and "[w]here the evidence shows with reasonable probability the degree of enhancement." 157 Ariz. at 157, 755 P.2d at 1145.

Here, no evidence suggested that plaintiff would have completely escaped injury had he been wearing a helmet. No evidence was introduced relating the degree of enhancement of injury that probably occurred because of plaintiff's helmet nonuse. Instead, the only testimony relating nonuse of a helmet to the injuries sustained was Dr. Christensen's opinion that plaintiff's "head injury *would not have been as severe* had he been wearing a helmet." This testimony gave the jury no guidance

in apportioning damages; any reduction thus would have been purely speculative. Juries must not be left to speculate on the issue of damages. *See Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 521, 446 P.2d 458, 464 (1968); *see also Dean v. Holland*, 350 N.Y.S.2d at 861–62. Although certainty in calculating damages is unnecessary, the jury must have some basis for making its determination. *Cf. Hercules Drayage Co. v. Chanco Leasing Corp.*, 24 Ariz.App. 598, 601, 540 P.2d 724, 727 (1975).

D. *Availability of Helmet.* The plaintiffs in *Law II* drove a car in which seat belts were installed. The supreme court concluded that "if a person chooses not to use an *available*, simple safety device, that person may be at fault." *Law II*, 157 Ariz. at 155, 755 P.2d at 1143 (emphasis added).

The record in this case is silent as to whether the plaintiff had an unworn helmet with him on his motorcycle. Such proof, however, is not indispensable to a defendant's assertion that a plaintiff's failure to wear a helmet constituted fault. We do not derive from *Law II* the proposition that a safety device must be within arm's length before one's failure to employ it can be argued to be fault.

The issue in these cases is whether a plaintiff measurably contributed to his own injuries by failing to meet his obligation "to conduct [him]self reasonably to minimize damages and avoid foreseeable harm to [him]self." *Law II*, at 153, 755 P.2d at 1141. Though availability bears on this issue of reasonable conduct in helmet cases, as it does in seat belt cases, we do not believe that availability and proximity equate.

Did a plaintiff own a helmet but leave it at home? Did a plaintiff borrow a motorcycle but decline to borrow the owner's helmet with it? Were helmets of the type defendants' experts say would have made a measurable difference reasonably available at a reasonable price? These and many other factors may be relevant on a case-by-case basis in determining the central comparative negligence question of the reasonableness of a plaintiff's behavior.

■ *E. Prospective Application of Law II.* After the parties had briefed and orally argued this case to this court, the Arizona Supreme Court issued its supplemental opinion in *Law v. Superior Court,* 157 Ariz. 147, 160, 755 P.2d 1135, 1148 (1988) (*Law III*). In *Law III,* the court decided to limit the decision's effect to prospective application, because the decision constituted a "dramatic change" in the law that could not fairly be applied retroactively. *Law III,* at 162, 755 P.2d at 1150. The original decision was made applicable only to accidents occurring after the date on which the mandate in *Law III* is filed. At 162, 755 P.2d at 1150.

*Law III* teaches us that plaintiff's damages cannot be reduced without prior notice of the need to wear a motorcycle helmet. Consistent with the holding in *Law III,* we must apply the principles enunciated here prospectively only to accidents occurring after the date on which the mandate is filed in this action.

We therefore reverse the trial court's order denying plaintiff's motion for a new trial. Plaintiff's helmet nonuse is inadmissible at the new trial to show enhancement of his injuries.

### 2. *Defendant's Conduct After the Accident*

■ Because we are remanding this case for a new trial, we also address plaintiff's contention that he was wrongfully precluded from presenting eyewitness testimony of defendant Becky Cheney's conduct immediately after the accident. Plaintiff argues that the jury should have been allowed to hear this testimony because it might have concluded that punitive damages should be imposed.

The question whether evidence of defendant's post-accident conduct was admissible arose when defendant filed a motion *in limine* to exclude such testimony. Defendant claimed that plaintiff intended to call eyewitnesses to testify that defendant considered leaving the scene of the accident and that plaintiff would argue that such evidence of post-accident conduct proved defendant had evil intentions in injuring plaintiff.

Defendant sought to exclude this evidence, arguing that it would be too speculative to be considered as evidence; that it would be irrelevant since defendant did not leave the scene; and that evidence of defendant's thoughts after an accident would not establish her state of mind when the accident occurred. The trial court granted the motion and excluded the testimony.

Based on the record before the trial court, we cannot conclude that the trial court erred. Plaintiff made no offer of proof regarding the substance of the evidence he sought to present or whether this evidence would have any bearing on defendant's state of mind when the accident occurred. Rule 103, Arizona Rules of Evidence, provides that error may not be predicated on a ruling excluding evidence unless the substance of the evidence was made known to the trial court. An offer of proof thus is a prerequisite to an appellate argument of admissibility of excluded evidence. *Montano v. Scottsdale Baptist Hosp., Inc.,* 119 Ariz. 448, 581 P.2d 682 (1978). This is not a case where the purpose and substance of the testimony were so obvious as to make an offer of proof superfluous. *Cf. Molloy v. Molloy,* 158 Ariz. 64, 68–69, 761 P.2d 138, 142–143 (App.1988). Even though defendant raised the admissibility of the evidence in a motion *in limine* to exclude the evidence rather than when plaintiff might have tried to offer the evidence at trial, plaintiff needed to respond in some way that would have shown the trial court that the evidence should not be precluded. The record in this case discloses no response to the motion *in limine;* therefore, the trial court's ruling to exclude the evidence was not error.

Plaintiff points out that this court has recognized the admissibility of post-accident conduct on the issue of punitive damages if the conduct has a reasonable relationship to the state of mind of the tortfeasor at the time of the event. *See Forquer v. Pinal County,* 22 Ariz.App. 266, 526 P.2d 1064 (1974). In *Forquer,* this court suggested that evidence of a driver's

failure "to stop and render aid after an accident, in connection with other evidence, may be considered by the jury in assessing punitive damages." 22 Ariz.App. at 269–70, 526 P.2d at 1067–68. In another case, based on a very detailed statement of the evidence to be presented about post-accident conduct, Division Two ruled that the trial court had committed prejudicial error in granting the motion *in limine* excluding the evidence. *Ehmke v. Hicks*, 148 Ariz. 450, 715 P.2d 306 (App.1986).

Assuming that the issue will arise again on remand and that plaintiff chooses to make an appropriate offer of proof, the trial court will have to decide whether the evidence concerning post-accident conduct offered in conjunction with any other circumstances of the case pointed out by plaintiff would tend to prove that defendant had an "evil mind" when she injured plaintiff. As our supreme court has recently stated:

> It is only when the wrongdoer should be consciously aware of the evil of his ac-

tions, of the spitefulness of his motives or that his conduct is so outrageous, oppressive or intolerable in that it creates a substantial risk of tremendous harm to others that the evil mind required for the imposition of punitive damages may be found.

*Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986). The admissibility of post-accident conduct on remand cannot be determined until the precise nature of the evidence is made known to the trial court.

This case is reversed and remanded for a new trial.

SHELLEY and FIDEL, JJ., concur.