Robert C. BURRELL, by and through his Conservator, Teresa B. SCHATZ, Plaintiff–Respondent,

v.

O'REILLY AUTOMOTIVE, INC., Defendant/Third–Party Plaintiff–Appellant,

v.

Easy Living, Inc., Third–Party Defendant–Respondent.

No. 26598.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 31, 2005.

---

Kevin Case, Case Law Firm, Kansas City, John C. Holstein, James E. Mead-ows, Shughart Thomson & Kilroy, Springfield, for appellant.

Michelle Boehm O'Neal, Alison R. Hershewe, Larry Nichols, Hershewe Law Firm, Joplin, for respondent Robert C. Burrell.

John M. Waldeck, Waldeck, Matteuzzi & Sloan, P.C., Kansas City, for respondent, Easy Living, Inc.

KENNETH W. SHRUM, Presiding Judge.

This is a negligence case in which a jury awarded Robert C. Burrell ("Plaintiff") damages for injuries he received during a collision between a vehicle owned by O'Reilly Automotive, Inc. ("O'Reilly") and a motorized scooter ridden by Plaintiff. O'Reilly tried to get contribution by joining Easy Living, Inc. ("ELI") as a third-party defendant. This failed, however, because the trial court entered a summary judgment favorable to ELI.

On appeal, O'Reilly urges reversal because (a) the court allegedly gave an erroneous definitional instruction on "scope and course of employment;" (b) the court rejected proffered evidence that had Plaintiff worn a helmet, his injuries would have been less severe; and (c) there were disputed issues of fact on whether ELI was negligent and thus, the court committed reversible error when it sustained ELI's summary judgment motion. We affirm.

FACTS

Plaintiff was forty-four years old at the time of the subject accident. The accident happened Sunday, August 5, 2001. At the time, Plaintiff was on a motorized scooter, a three-wheeled device designed to increase the mobility of persons with disabilities.[1] The accident occurred when a pick-

1. Our discussion in this opinion of "motor- ized scooters" is limited to those types of

up truck owned by O'Reilly and driven by Nicholas Toliver ("Toliver") struck Plaintiff's scooter as Plaintiff was crossing a street in Joplin, Missouri. Due to the impact, Plaintiff fell from the scooter, his head struck the pavement, and he was injured.

Before the accident, Plaintiff had many physical and mental limitations. These were caused by his myotonic dystrophy affliction.[2] His problems included a low I.Q. (mid-sixties), impaired ability to speak, vision problems, difficulty walking, and decreased reflexes. Because of his limitations, a guardian was appointed for Plaintiff in 1989. In 1996, a conservator was appointed for him. Moreover, Plaintiff began receiving assisted living services from ELI several years before the accident.

Via a contract with Missouri's Department of Health ("the Department"), ELI is a company engaged in the business of helping persons with disabilities. One type of service provided by ELI is denominated "supported living."[3]

As of August 5, 2001, ELI provided Plaintiff with "supported living services" to help him deal with issues related to his myotonic dystrophy. Under the plan developed for Plaintiff, ELI was "to provide supported living services to [Plaintiff] consisting of training, teaching, modeling and verbal prompts to help [Plaintiff] keep 'his home clean and tidy,' help him complete a daily 'personal hygiene routine,' help him with 'budgeting,' and help him deal with problems with 'phone service, interactions with apartment management, [and] using public resources such as the library.'" This, however, was not a plan for full-time services. To the contrary, ELI was to provide only twenty to thirty hours of staff service hours each week, with no staff service hours on Sundays.[4]

In 1998, Plaintiff told ELI employees he wanted to buy a motorized scooter, specifically, one advertised as "designed to increase the mobility of persons with disabilities." At the time, ELI staff members saw that Plaintiff's myotonic dystrophy prevented him from walking long distances; accordingly, ELI staff members helped Plaintiff obtain a scooter like the one he had seen advertised. They did this by going with Plaintiff when he talked to his physician about using a scooter and by helping Plaintiff with the Medicaid paperwork.

On March 5, 1998, Dr. Andrew, Plaintiff's neurologist, wrote a prescription so Plaintiff could get the scooter. He did so because he "felt strongly" it was something Plaintiff needed due to the "profound weakness" of his muscles.[5] Medicaid ultimately approved Plaintiff's request for a scooter. Thereon, Plaintiff got the scooter he was using on the accident date.

---

scooters similar to the one used by Plaintiff, i.e., three-wheeled devices designed to increase the mobility of persons with disabilities.

2. Myotonic dystrophy is a genetically transmitted form of muscular dystrophy that causes a gradual weakening of the muscles and mental retardation.

3. ELI's contract with the Department required that it initially establish a personal plan for supported living services for each client and then update that plan each month.

4. The "no Sunday" assistance was at Plaintiff's express request.

5. Dr. Andrew testified, "My point ... was to get [Plaintiff] out and about to keep him independent. ... I want[ed] him to go farther and to continue to be out in the community." Dr. Andrew placed no restrictions on Plaintiff's use of the motorized device. He explained, "When we are prescribing it to a patient, we prescribe to those that have the mental capacity to be able to make reasonable decisions."

Just before the accident, Plaintiff's destination was the local library. He was on a sidewalk on the west side of Main Street, headed north. Plaintiff was not wearing a helmet, but was accompanied by a friend who was walking beside him.[6] As Plaintiff approached the intersection of Eighth and Main Streets, Toliver was driving the O'Reilly pick-up east on Eighth Street. He was going to a pizza store to get lunch for himself and two fellow employees, following which he would go back to the O'Reilly store with the food. Because this was a Sunday—a day when O'Reilly employees worked straight through without a lunch break—there was testimony that Toliver's trip for pizza benefited O'Reilly since it allowed for broader store coverage and more customer service, i.e., the three store employees could be in house and serve customers while eating lunch.

When Toliver got to the intersection of Main and Eighth, he stopped because he was facing a red light. After stopping, Toliver looked left for traffic and, seeing none, started a right turn "on red." Simultaneously, Plaintiff entered the crosswalk across Eighth Street. As Toliver turned right, the O'Reilly truck struck the scooter and wedged it under the truck. This caused the scooter to lean over and Plaintiff either fell from, or was knocked from, the scooter. As a result, Plaintiff suffered multiple injuries, including severe head and brain injuries caused by his head striking the pavement.

Following the accident, Plaintiff sued O'Reilly for damages. The trial court rejected O'Reilly's third-party claim against ELI via summary judgment. The jury ruled for Plaintiff and judgment was entered on the jury's verdict. This appeal by O'Reilly followed.

### ALLEGED ERROR IN GIVING "DUAL PURPOSE" DEFINITION INSTRUCTION

Plaintiff relied on *respondeat superior* principles and the "dual purpose doctrine" to seek damages from O'Reilly for the accident caused by Toliver. Under the *respondeat superior* doctrine, liability for Toliver's negligence could be imposed on O'Reilly, *provided* Toliver was O'Reilly's employee *and* was engaged in an activity within the course and scope of his employment at the time of the accident. *See McHaffie v. Bunch*, 891 S.W.2d 822, 825[1] (Mo.banc 1995).

■ Plaintiff, however, was faced with the general rule that if at the time of an accident an employee has left work to fulfill a personal purpose not connected with his employment—such as going to lunch—the relation of employer and employee is thereby suspended and the employer is not liable for his employee's acts during the suspension. *See Miceli v. Williams*, 293 S.W.2d 136, 138[3] (Mo.App.1956). This rule attends "even though in carrying out his private mission the employee makes use of the employer's motor vehicle." *Id.* (citing *Stone v. Reed*, 247 S.W.2d 325, 330 (Mo.App.1952)).

■ Plaintiff does not appear to seriously question or dispute the "going to lunch" rule. He asserts, however, that an exception to that rule applies here, namely, the "dual purpose doctrine." This exception says that if the employee's work requires

---

**6.** There was uncontroverted evidence that after Plaintiff got the scooter, ELI caregivers told him he should wear a helmet when riding the scooter, explaining that it was needed to protect his head if he fell from the scooter. Plaintiff, however, did not heed their advice, telling staff members to mind their own business. His stated preference was to wear a cowboy hat. In a post-accident deposition, Plaintiff acknowledged he had a helmet, but had only worn it twice as it was too tight on his head.

the travel, the employee is deemed to be in the course and scope of his employment although he may have been attending to a simultaneous purpose. *Tuttle v. Muenks*, 964 S.W.2d 514, 518[6] (Mo.App.1998). For the doctrine to apply, the travel must have been necessary even where a personal purpose is lacking. *Id.*

With this in mind, we turn to O'Reilly's second point. In relevant part, it reads: "THE TRIAL COURT ERRED IN FAILING TO GRANT O'REILLY'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF AND IN SUBMITTING INSTRUCTION NO. 6 AND FAILING TO ENTER JUDGMENT NOT WITHSTANDING THE VERDICT ... BECAUSE THE EVIDENCE FAILED TO ESTABLISH THAT ... TOLIVER WAS OPERATING A VEHICLE AS AN ... EMPLOYEE OF ... O'REILLY ..., UNDER THE DUAL PURPOSE DOCTRINE, IN THAT AT THE TIME OF THE COLLISION, THE ONLY EVIDENCE WAS THAT ... TOLIVER WAS ON HIS WAY TO LUNCH, O'REILLY'S BUSINESS DID NOT CREATE THE NECESSITY FOR THE TRIP, MR. TOLIVER DID NOT HAVE O'REILLY'S AUTHORITY TO USE ITS VEHICLE FOR SAID PURPOSE AND WAS NOT ACTING IN THE COURSE AND SCOPE OF HIS EMPLOYMENT FOR O'REILLY."

 Each point relied on for appellate review of alleged error should definitely formulate and isolate the exact issue to be reviewed. *Burns v. Elk River Ambulance, Inc.*, 55 S.W.3d 466, 477[17] (Mo.App.2001). This point does not meet that test as it charges the trial court with three separate and distinct errors. More than that, the point fails to the extent that it attempts to raise a claim it has waived, specifically, a claim that there was insufficient evidence to go to the jury on Plaintiff's "dual purpose" exception theory.

To explain, O'Reilly never denied Toliver was its employee; instead, it argued he *was not* acting within the scope and course of his employment when he used O'Reilly's truck to get lunch for himself and fellow employees. O'Reilly's defense was that Toliver was on a personal purpose trip (going for lunch) and the trip served no purpose for O'Reilly; consequently, the dual purpose theory was not an option for Plaintiff and he should lose.

O'Reilly's problem, however, is that it waived its claim that Plaintiff's evidence failed to create a jury question on the "course and scope" issue. It did so by not presenting that claim in its directed verdict motions. Inexplicably, O'Reilly's directed verdict motions focused exclusively on a negligent hiring theory that Plaintiff had pled. They lacked *any* assertion that there was insufficient evidence to go to the jury on the "course and scope of employment" issue.[7]

 A motion for judgment notwithstanding the verdict is a motion to have judgment entered according to the motion for directed verdict. *Carter v. St. John's Reg'l Med. Center*, 88 S.W.3d 1, 11 (Mo.App.2002). "An issue not raised in a motion for a directed verdict may not be used to seek a judgment notwithstanding the verdict on that issue or for obtaining appellate review of the trial court's denial of the j.n.o.v. on that ground." *Id.* at 12–13[12]. Since claims that Plaintiff failed to prove Toliver was acting within the course and scope of his employment were not in

---

7. It is appropriate to note that O'Reilly's appellate lawyers are not the lawyers who tried the suit or filed the after-trial motions.

the motions for directed verdict, such claims cannot be used as a basis to seek a judgment notwithstanding the verdict or for obtaining our review of the trial court's denial of the judgment notwithstanding the verdict on that ground. O'Reilly cannot retrieve an insufficiency of evidence claim in the manner attempted.

■ We turn now to O'Reilly's Point II claim that reversible error was committed when the trial court denied O'Reilly's motion for summary judgment. We do not address that claim of trial court error because a trial court order denying a party's motion for summary judgment is not reviewable, even when appeal is taken from a final judgment. *Reis v. Peabody Coal Co.*, 935 S.W.2d 625, 632[6] (Mo.App.1996); *Gilmore v. Erb*, 900 S.W.2d 669, 671 (Mo. App.1995).

■ We next consider O'Reilly's claim that there was insufficient evidence to support giving instruction No. 6, patterned after the MAI–13.03 definitional instruction of "scope and course of employment." The challenged instruction reads:

"Nicholas Toliver's operation of O'Reilly's motor vehicle was within the 'scope and course of employment' as that phrase is used in these instructions if:

"1. it was done by ... Toliver partially to serve the interests of O'Reilly and partially to carry out the interests of Toliver, and

"2. O'Reilly's business created the necessity for the trip, and

"3. O'Reilly either controlled or had the right to control the physical conduct of ... Toliver."

At the instruction conference, O'Reilly's trial counsel's objected to Instruction No. 6, saying:

"[W]e believe the scope of employment as defined in Instruction Number Six, MAI 13.03, is inappropriate in this case in that the scope of employment should be instructive to the jury based upon [MAI] 13.05 which is Instruction A.

"I don't believe there's any evidence of any special benefit or direct employment purpose for Mr. Toliver's lunch trip and thus the general scope of employment instruction [MAI-] 13.05 should be given." [8]

When the instruction conference was held, the following situation attended. First, it was undisputed that Toliver was employed by O'Reilly; consequently, the only vicarious liability issue in dispute was that of "scope and course of employment." Second, O'Reilly had already tacitly conceded that the "scope and course of employment" issue was a fact question to be resolved by the jury; that Plaintiff had adduced sufficient evidence to make a submissible case on that question. O'Reilly did this when it failed to challenge the submissibility of Plaintiff's case via its motions for directed verdict. Third, since "scope and course of employment" was a disputed fact issue, the verdict director necessarily required the jury to decide if "Toliver was operating [O'Reilly's truck] within the scope and course of his employment by O'Reilly at the time of the collision." Fourth, since the phrase "course and scope of employment" was in the verdict director, the trial judge had to choose a definitional instruction and submit it to

8. The proffered Instruction "A," patterned after MAI–13.05, read:

"Acts were within the scope and course of employment as that phrase is used in these instructions if:

"1. They were part of the work ... Toliver was hired to perform, and

"2. They were done by ... Toliver to serve the business of ... O'Reilly."

the jury. MAI 18.01, Notes on Use (1990 Revision), n. 2.[9]

Confronted with this situation, the court ruled that it was "appropriate to submit Instruction Six in accordance with 13.03 as opposed to 13.05 as suggested by [O'Reilly]." Under the peculiar circumstances of this case, the ruling was not erroneous.

On the one hand, there was no evidence from which the jury could find or reasonably infer that Toliver's trip was undertaken exclusively for O'Reilly's benefit. O'Reilly recognizes this, when in its brief, it says:

> "By using the dual purpose definition plaintiff's counsel had the advantage of being able to argue that any benefit, however slight, was sufficient. Indeed he argued that because Mr. Toliver was 'on the clock,' was given a shorter lunch break and intended to bring lunch back to co-employees, the trip to lunch partially served the interests of O'Reilly. As noted above, such facts are insufficient to bring Mr. Toliver into the application of the dual purpose doctrine. Had a proper instruction been given, plaintiff would have the impossible task of arguing that going to lunch was 'part of the work [Mr. Toliver] was employed to perform' and the almost insurmountable task of arguing that driving the vehicle was 'done to serve the business of O'Reilly.'" (Citations omitted.)

On the other hand, there was evidence in the record that O'Reilly had impliedly consented to Toliver using O'Reilly's truck to get meals for its employees. This is found in testimony to the effect that it was common practice for employees to use company vehicles to get their lunches; that employees generally used their discretion when deciding if an O'Reilly vehicle should be used; and that the keys for the subject truck were accessible to all employees. There was also testimony from O'Reilly management personnel that on Sundays less than a full staff of employees was used; that because of this, the employees were not given a lunch break, and it benefited O'Reilly to have employees eat "in-house" so they could continue to wait on customers as needed. Additionally, there was evidence that Toliver had less counter experience than did the other two employees in the store on that Sunday who had been specifically trained for that job. Consequently, it was reasonably inferable that Toliver's absence would least likely have adversely affected O'Reilly's business on that date.

This is some evidence supportive of Plaintiff's dual doctrine theory, i.e., Toliver's trip to get lunch was made partially to promote the interests of O'Reilly and O'Reilly's scheduling practices created the necessity for the trip. Whether this dual-purpose doctrine evidence was insufficient to make a submissible case was not preserved; consequently, we will not convict the trial judge of committing error when it chose a definitional instruction that had some evidentiary support over one that had none. Point denied.

---

9. O'Reilly's counsel objected to the verdict director (instruction No. 8) on the basis there was insufficient evidence to make a jury case on whether Toliver was within the scope and course of employment at the time of the accident. However, O'Reilly's after-trial motions never mentioned instruction No. 8. The *only* alleged instructional error raised there reads: "The legal issue of the course and scope of ... Toliver's employment was not for the jury and the instruction given (MAI 13.03) did not correctly state Missouri law." Exactly what was intended by this is unclear. Suffice it to say that even if O'Reilly intended by this language to claim there was insufficient evidence to support giving instruction No. 8, it is a claim O'Reilly has abandoned on appeal.

## REJECTED EVIDENCE THAT HELMET WOULD MINIMIZE HEAD INJURY

Before trial, Plaintiff moved to exclude any evidence that he was not wearing a helmet at the time of the accident. Plaintiff asserted such evidence was irrelevant because he was under no duty to wear a helmet.

At a pre-trial hearing on Plaintiff's motion, O'Reilly's lawyer countered that "no helmet" evidence was admissible as it supported O'Reilly's affirmative defense of "mitigation [of] damages." Continuing he said, "that's the issue ... separate from causation which we would offer the testimony for failure to wear a helmet." After hearing the arguments, the trial court sustained Plaintiff's motion in limine. In doing so, it appeared to accept Plaintiff's assertion that he was under no duty to wear a helmet.

At trial, Dr. McNish ("McNish") testified for the defense. He was a physician and engineer who worked in the field of injury causation analysis. McNish gave various opinions about the kinetics of the accident and how Plaintiff sustained his head injury. After a recess during McNish's testimony, O'Reilly offered to prove, via McNish, that had Plaintiff been using a standard bicycle helmet, he would not have suffered either a scalp laceration or a skull fracture. The court rejected the proffered testimony without explanation.

■ O'Reilly's third point charges reversible error resulted when this evidence was excluded. It reasons that this ruling precluded O'Reilly from "raising the defense of contributory fault and mitigation of damages" based on Plaintiff not wearing a helmet.[10]

With respect to Plaintiff's pre-accident conduct, O'Reilly insists Plaintiff unreasonably failed to avoid injury by not wearing a helmet when he was under a duty to do so; consequently, the trial court erred in excluding McNish's opinions about the beneficial effects for Plaintiff had he worn a helmet. O'Reilly claims it was prejudiced by such ruling because the ruling deprived it of the only evidence that warranted instructing the jury on contributory fault.

■ O'Reilly's initial argument that Plaintiff had a pre-accident duty to wear a helmet is based on section 302.020.2.[11] In relevant part, section 302.020.2 provides that "[e]very person operating ... any ... *motortricycle*, as defined in section 301.010 ... upon any highway of this state shall wear protective headgear at all times the vehicle is in motion."[12]

---

10. We immediately reject any notion that "mitigation" of damages was an issue here. Mitigation of damages is a well settled principle requiring that a party injured by breach of a tort duty make some reasonable effort to minimize the damages *after* breach and injury have been inflicted. *Stipp v. Tsutomi Karasawa*, 318 S.W.2d 172, 175 (Mo.1958). Failure to mitigate after injury is properly submitted to a jury via MAI 32.29, whereas fault because of failure to avoid injury, i.e., pre-accident fault, is properly submitted by a comparative fault instruction. *See also Bowan v. Express Medical Transporters*, 135 S.W.3d 452, 459 (Mo.App.2004). No evidence exists in this case, either in the offer of proof or otherwise, that Plaintiff failed to minimize damages or failed to avoid aggravating the injury during the post-injury period.

11. All statutory references are to RSMo (2000), unless otherwise stated. All rule references are to Missouri Rules of Civil Procedure (2005), unless stated differently.

12. Motortricycle, as defined in section 301.010(37), is "a *motor vehicle* operated on three wheels." The phrase *"motor vehicle"* is also statutorily defined. Thus, section 301.010(33) defines "motor vehicle" as "any self-propelled vehicle not operated exclusively upon tracks, except farm tractors." Finally, *"vehicle"* is defined in section 301.010(64) as "any mechanical device on wheels, designed

In arguing Plaintiff had a "duty" to wear a helmet because of section 302.020.2, O'Reilly points out that Plaintiff's personal mobility scooter had three wheels; consequently, it insists the scooter met the section 301.010(37) definition of "motortricycle." *See* n. 12. Continuing, O'Reilly argues the subject scooter clearly was self-propelled and not operated exclusively on tracks; accordingly, it was a "motor vehicle" per section 301.010(33). *Id.* Next, O'Reilly maintains Plaintiff's mobility device was being "used" on a "highway" at the time of the accident; consequently, it was a "vehicle" as defined by section 301.010(64), and thus, helmet use was mandated by section 302.020.2. *See, e.g., Covert v. Fisher,* 151 S.W.3d 70, 74 (Mo.App.2004); *Stonger ex. rel. Stonger v. Riggs,* 85 S.W.3d 703, 707–08 (Mo.App. 2002) (holding that devices not designed for highway use, namely a golf cart and a riding lawn mower, respectively, were motor vehicles because they were being used on highways at the time of accident).

Absent from this argument however, is any consideration of the "motorized wheelchair" exception mentioned in section 301.010(64). *See* n. 12. Specifically, if Plaintiff's scooter (admittedly a device "designed to increase the mobility of persons with disabilities") is a "motorized wheelchair" within the meaning of section 301.010(64), Plaintiff, as a "handicapped person," would be exempt from the statutory mandate of wearing a helmet.

O'Reilly attempts to answer the notion that Plaintiff's scooter might be a "motorized wheelchair" by saying that (1) Plaintiff never alleged or proved his scooter qualified as a "motorized wheelchair," and (2) the status of his scooter, i.e., whether it was a "motorized wheelchair" or a "trimo-

torcycle" was a fact question that should have been presented to the jury. We find no merit in O'Reilly's position.

Although, the terms "motorized scooter" and "motorized cart" are not statutorily defined, neither is the term "motorized wheelchair." Deciding whether the legislature intended the phrase "motorized wheelchair" to include any assistive device "designed to increase the mobility of persons with disabilities" is purely a matter of statutory interpretation; consequently, it is a question of law, not fact. *State v. Laplante,* 148 S.W.3d 347, 348[1] (Mo.App. 2004).

When the meaning and scope of a statute is questionable, it should be given a sensible construction considering the objective the legislature sought to accomplish and with an eye on resolving the problem addressed therein. *Ports Petroleum Co., Inc. of Ohio v. Nixon,* 37 S.W.3d 237, 240[4] (Mo.banc 2001). Insight into the legislature's objectives can be gained by reviewing earlier versions of the law and conditions existing at the time of enactment of the subject statute. *In re M.D.R.,* 124 S.W.3d 469, 472[1] (Mo.banc 2004); *Bachtel v. Miller County Nursing Home Dist.,* 110 S.W.3d 799, 801 (Mo.banc 2004)

The Missouri legislature exempted a "motorized wheelchair operated by disabled persons" from the consequences of being classified as vehicles in 1988 and 1989. It did this by amending sections 301.010(64) and 302.010(23), RSMo (1969), in those respective years. These amendments came after *Vanasse v. Plautz,* 538 S.W.2d 928 (Mo.App.1976), was decided.

The *Vanasse* court ruled that a disabled operator of an electrically powered wheel-

---

primarily for use, or used, on highways ... except motorized wheelchairs operated by

handicapped persons."

chair was contributorily negligent for operating such device on a public street without lights. *Id.* at 929–32. It found that the legislature "cognizably intended to subject a virtually limitless classification of vehicles" to the "lighting" requirements of sections 304.120 to 304.570, RSMo (1969). *Id.* at 931.

 We presume the legislature knew of *Vanasse* and its consequences when it exempted "motorized wheelchairs operated by disabled persons" from being classified as "vehicles" for Chapters 301 and 302 purposes. *See Greenbriar Hills Country Club v. Dir. of Rev.,* 47 S.W.3d 346, 352 (Mo.banc 2001). We also assume that the intent of the legislature in enacting a statute is to serve the best interests and welfare of the citizenry at large. *Eaton v. Dir. of Rev.,* 929 S.W.2d 282, 284[5] (Mo.App.1996). A statute must not be narrowly construed if such construction defeats the purpose of the statute. *Id.* at 284[4].

Significantly, Missouri has large numbers of legislatively created programs and policies designed to help the disabled and elderly to live independently, to the extent such independence is reasonably consistent with their safety. We need not try to list all such programs; suffice it to say that such policies exist and are very important. Moreover, these policies not only benefit the disabled and elderly, but they also serve the best interests and welfare of the citizenry at large. This follows because, to the extent the disabled and elderly can be helped to achieve any degree of independent living without institutionalization, the state and its citizens avoid the higher cost of institutional living for such persons.

Thus, it appears that the legislature intended by its "motorized wheelchair" amendments to exempt disabled persons who use "motorized wheelchairs" on public highways from the Chapters 301 and 302 requirements. We find in this a legislative intent to promote the independence and confidence of disabled persons, especially for those physically or mentally unable to meet Chapters 301 and 302 requirements for vehicle operators.

It is a matter of common knowledge and observation that the use of assistive devices "designed to increase the mobility of persons with disabilities" has increased in recent years. To narrowly construe the phrase "motorized wheelchair" as used in section 301.010(64) to mean that only motorized chairs mounted on two large side wheels would escape classification as a vehicle would frequently defeat the purpose of the amendment. We conclude this was not what the legislature intended. We find that the legislative intent was to exempt any assistive device "designed to increase the mobility of persons with disabilities" from being classed as a vehicle, provided the device was being operated by a disabled person at the time of the questioned event.[13] Having made that finding, it follows Plaintiff was not under a duty to wear a helmet because of section 302.020.2. We reject O'Reilly's argument to the contrary.

 O'Reilly also argues that the common-law duty of ordinary care for one's own safety should encompass the use of a

---

13. Our view on this is bolstered by the fact that the legislature, in another context, has classified both "motorized scooters" and "motorized wheelchairs" as "assistive devices." This occurred in Chapter 407 regarding merchandising practices. Specifically, section 407.950 defines "[a]ssistive device" as "any device ... that a consumer purchases ... which is used for a major life activity which includes, but is not limited to ... motorized wheelchairs, motorized scooters, and other [aids] that enhance the mobility of an individual."

safety helmet by Plaintiff while operating his motorized scooter, and that the trial court erred when it implicitly ruled Plaintiff had no such duty and used that rationale for excluding McNish's testimony.

For the most part, O'Reilly supports its argument by citing cases from foreign jurisdictions. Significantly, however, the cases cited all involve motorcycle riders or riders of all-terrain vehicles ("ATVs"); consequently, they simply are not on point and do not support O'Reilly's argument.

This is best illustrated by *Stehlik v. Rhoads*, 253 Wis.2d 477, 645 N.W.2d 889 (2002). There, the Wisconsin court's rationale for approving the "helmet defense" was as follows:

> "[T]he safety benefits of wearing a helmet while operating or riding a non-enclosed vehicle such as an ATV are a matter of common knowledge, supported by statistical evidence.
>
> "ATVs are, after all, open-air motorized vehicles capable of reaching moderate to high speeds, and are, by design, intended to be operated on all types of off-road terrain. The risks associated with ATVs are well-known. Under these circumstances, an ordinarily prudent person knows or reasonably should know that wearing a safety helmet while operating or riding an ATV protects against serious head injury."

645 N.W.2d at 896–97 (citations omitted).[14]

We also note that the *Stehlik* case and others relied on by O'Reilly represent the minority view on this issue. What might be the majority rule is that there is no common-law duty for a motorcycle or ATV rider to wear a helmet. *Warfel v. Cheney*, 157 Ariz. 424, 758 P.2d 1326, 1330 (1988) (holding motorcycle rider had common-law duty to wear helmet, yet recognized that the "majority rule" was otherwise).

Which of these views should be adopted in Missouri for motorcycle and ATV riders is simply not the issue here. The question here is whether there are sound policy reasons for saying that disabled persons who use motorized wheelchairs and scooters designed to increase their mobility have a common-law duty to wear helmets when riding such devices. We find no such reasons exist under the circumstances of this case.

Unlike the motorcycle and ATV cases, there is no evidence in this record, no element of common knowledge of which this court is aware, and no statistical data available to support the notion that using a personal mobility scooter for the purposes for which it was designed poses risks that are comparable to the risks associated with riding ATVs or motorcycles. O'Reilly has certainly not directed us to any such studies about personal mobility scooters and we have found none.

What O'Reilly wants is a ruling that the common-law duty of ordinary care for one's own safety mandates the use of safety helmets by people using motorized scooters that are designed to increase the mobility of a person with disabilities. It is an argument made without analysis or support. It is one that ignores this state's policy of promoting independence for the disabled and elderly. We cannot discern a basis in the common law to require all disabled persons, or all persons with less than normal motor skills, or all persons with less than normal coordination, or all

---

**14.** That the *Stehlik* court intended to limit the scope of its ruling to ATVs and motorcycles was made clear when it said: "Our conclusion here pertains to helmet use while operating or riding a motorized, non-enclosed, moderate-to-high speed vehicle such as an ATV or like vehicle. *We do not address the treatment of helmet use in other contexts.*" 645 N.W.2d at 897, n. 9 (emphasis supplied).

persons with less than normal reflexes, to wear helmets, although it is foreseeable that such persons often cannot react as capably to avoid injury, as can the non-disabled, when involved in an accident with a tortfeasor. We cannot imagine that imposing a duty on disabled persons to wear helmets every time they move from one location to another would instill self-confidence and feelings of self-worth in such persons. We have found no authority anywhere for such a view. To state this as a possibility shows why we reject the argument.

We conclude that the trial court correctly refused to recognize a new tort duty as urged by O'Reilly, and thus, it did not err in ruling that McNish's offer-of-proof testimony was inadmissible. Point denied.

### ALLEGED ERROR IN GRANTING SUMMARY JUDGMENT FOR "ELI."

O'Reilly's third-party petition sought "indemnification, or alternatively, for contribution" from ELI with regard to Plaintiff's claim against O'Reilly. The premise of O'Reilly's third-party petition was that ELI owed a duty to Plaintiff to provide whatever services were necessary to always protect Plaintiff "from [being a] danger to himself or others." Specifically, O'Reilly alleged ELI was under a duty to prevent Plaintiff from having or using a motorized scooter, or alternatively, that ELI was under a duty to supply Plaintiff with protective headgear and require Plaintiff to wear such headgear when operating the scooter on public streets or sidewalks. O'Reilly also alleged ELI had a duty to report Plaintiff's unsafe use of the scooter to the Department. These claims were adjudicated against O'Reilly when the trial court sustained ELI's motion for summary judgment.

In Point I, O'Reilly charges the trial court erred by sustaining ELI's summary judgment motion "because there were disputed issues of fact that ELI's conduct was negligent, in that

"(1) the motion for summary judgment did not challenge [O'Reilly's] claim that ELI had negligently provided services to [Plaintiff] and ELI failed to take action to protect [Plaintiff] from being a danger to himself or others and ELI negligently permitted [Plaintiff] to operate the motor scooter in direct violation of the probate court's order, [and]

"(2) a fact issue existed as to whether the motorized scooter operated by [Plaintiff] and supplied by ELI was a 'motor vehicle' which Plaintiff was prohibited from operating by order of the probate division of the circuit court of Jasper county, and

"(3) a fact issue existed as to whether ELI breached the duty to [Plaintiff] by negligently supplying him with a motorized scooter but not supplying appropriate protective headgear or not requiring that [Plaintiff] wear protective headgear when operating the scooter on public streets or sidewalks."

Our review of the grant of summary judgment is essentially *de novo.* *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376[4] (Mo.banc 1993). If there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Daniels v. Senior Care, Inc.*, 21 S.W.3d 133, 135 (Mo.App.2000). The key to summary judgment is the undisputed right to judgment as a matter of law, not simply the absence of a question of fact. *Murphy v. Jackson Nat'l Life Ins. Co.*, 83 S.W.3d 663, 665 (Mo.App.2002).

For O'Reilly to prevail in its claim for contribution based on ELI's al-

leged negligence, it must show, *inter alia,* that ELI had a duty to protect Plaintiff from injury under the circumstances of this case. *Horneyer v. City of Springfield,* 98 S.W.3d 637 (Mo.App.2003). The duty element stands separate from other elements of negligence because the existence of a duty is a question of law to be decided by the court. *Stitt v. Raytown Sports Ass'n, Inc.,* 961 S.W.2d 927, 930[2] (Mo. App.1998).

> "[W]hether a duty exists 'depends upon a calculus of policy considerations.' *Lough v. Rolla Women's Clinic, Inc.,* 866 S.W.2d 851 (Mo. banc 1993). Among these considerations, '[f]oreseeability is the paramount factor in determining existence of a duty, but a relationship between the parties where one is acting for the benefit of another also plays a role.' *Id.* ... As such, *foreseeability is not enough to establish a duty. Id.* In this respect, *there must* also *be some right or obligation to control the activity which presents the danger of injury.*"

*Id.* (emphasis supplied). *See Burns v. Black and Veatch Architects, Inc.,* 854 S.W.2d 450, 457 (Mo.App.1993) (holding foreseeability and realization of the possibility that a dangerous situation may have been created are not enough, standing alone, to establish a duty; there must also be some right or obligation to control the activity that presents a danger of injury).

▇▇ The sources for finding a duty of care are multiple, i.e., it can be imposed by controlling statutes, or assumed via contract, or imposed by common law under the circumstances of a given case. *Scheibel v. Hillis,* 531 S.W.2d 285, 288[2] (Mo. 1976); *Bowan,* 135 S.W.3d at 457. Here, O'Reilly relies on each of those sources to argue there were relevant, controverted facts from which an inference could be drawn that ELI owed a duty to Plaintiff under the attendant circumstances.

In considering the "right to control" element of this analysis, the following is relevant. There were two probate court cases filed in Jasper County, Missouri, involving Plaintiff. The first (Estate No. No. CV389–299P) was filed in 1989 and another in 1996 (Case No. 396–075P). Plaintiff was adjudged incapacitated and disabled in both cases and both judgments recited Plaintiff "shall not be permitted to operate a motor vehicle." Letters of guardianship were issued in the 1989 case, whereas letters of conservatorship were issued in the 1996 case.

In its brief, O'Reilly asserts that "[a] significant area of controversy is whether [Plaintiff] was 'his own guardian' " at the time of the accident. We agree that the summary judgment filings arguably raise fact issues about whether Plaintiff had a guardian on August 5, 2001, and if so, whether his sister or the public administrator was his guardian.

We do not agree, however, that these are genuine issues of *material* fact. This follows because neither ELI nor its employees were ever guardians of Plaintiff. This being so, what right did ELI or its employees have "to control the activity" that presented the danger of injury, i.e., Plaintiff's use of the motorized scooter without wearing a helmet? *Stitt,* 961 S.W.2d at 930. What right, or power, or authority did ELI have to take this device away from Plaintiff, or prohibit its use by him unless he wore a helmet? O'Reilly has not provided an answer to these questions and we have found none.

Because ELI had no power or right to control Plaintiff's ownership and use of the scooter, we rely on cases such as *Stitt,* 961 S.W.2d at 931, and *Burns,* 854 S.W.2d 450, to hold that ELI had no duty to prohibit

Plaintiff from owning the scooter, nor did it have a duty to control his use of it, nor did it have a duty to enforce a helmet use recommendation. Our view on this is reinforced by the fact that ELI was not contractually obligated to provide "support services" or monitor Plaintiff on Sundays, nor was there any evidence from which it could be inferred ELI had assumed that obligation before the accident; consequently, it had no way to monitor or control what Plaintiff did with his scooter on those days.

▆▆▆ In another argument, O'Reilly maintains that it would be obvious to a reasonable person that Plaintiff's continued operation of the scooter on the streets and sidewalks of Joplin posed an imminent danger to himself, if not to others. This, says O'Reilly, is based on Plaintiff's history of dangerous operation of the scooter, lack of balance, ignored warnings to slow down, vision problems, probate orders forbidding use of motor vehicles, and physical impairments. With that as its premise, O'Reilly insists ELI was under a duty imposed by contract and statute to *report* to the Department that Plaintiff was ignoring the admonitions given him to "slow down" when riding his scooter and to wear his helmet.

The contract provision that O'Reilly relies on reads: [15]

"73. Under circumstances, *as referenced in 632.300* RSMo, in which a client's conduct is jeopardizing the safety of the client himself or others in the community, the contractor SHALL immediately notify first the mental health coordinator and secondly the authorizing Department facility. If an immediate response is needed to insure the health and/or safety of the client or others, the local law enforcement officials SHALL also be notified."

(Emphasis supplied.)

Section 632.300 (referenced in the contract) is implicated when there is a possible need for involuntary civil detention of an individual who is so affected by a mental disorder that he presents a *"likelihood of serious harm"* to himself or others. Because sections 632.300–.475 provide the procedures and standards for involuntary treatment and detention, the "likelihood of serious harm" standard is a high one and is only met when one or more of the following situations attend:

"(a) A substantial risk that serious physical harm will be inflicted by a person upon his own person, as evidenced by recent threats, including verbal threats, or attempts to commit suicide or inflict physical harm on himself. . . .

"(b) A substantial risk that serious physical harm to a person will result or is occurring because of an impairment in his capacity to make decisions with respect to his hospitalization and need for treatment as evidenced by his current mental disorder or mental illness which results in an inability to provide for his own basic necessities of food, clothing, shelter, safety or medical care, or his inability to provide for his own mental health care which may result in a substantial risk of serious physical harm. . . .

"(c) A substantial risk that serious physical harm will be inflicted by a person upon another as evidenced by recent overt acts, behavior or threats, including verbal threats, which have caused harm or which would place a reasonable per-

---

15. The contract referred to is that between ELI and the Department of Health.

son in reasonable fear of sustaining such harm."

Section 632.005(9).

We find no basis for O'Reilly's implicit contention that Plaintiff's conduct was such as to cause a reasonable person to believe Plaintiff should be considered for involuntary commitment to a mental health facility. It follows, therefore, that neither the contract provision nor section 632.300 imposed a duty on ELI to report to the Department or any other agency about how Plaintiff was using the scooter.

O'Reilly also claims summary judgment was inappropriate because there remained a disputed fact about whether Plaintiff's scooter should be classified as a "motortricycle." O'Reilly's premise is two-fold: First, that classification of this device was a question of fact, and second, resolution of such "fact question" favorably to O'Reilly would give rise to a statutory duty in ELI to keep Plaintiff from operating the scooter without an operator's license and without protective headgear in violation of sections 303.020.1 and 302.020.2.

■■■ This argument lacks merit for two reasons. First, as explained earlier, whether Plaintiff's scooter should be classified as a "motortricycle" or a motorized "wheelchair" is a question of law. Second, we have already found that ELI had neither the right nor power to control Plaintiff in the use of his scooter; therefore, no duty can be imposed on ELI to preclude or regulate Plaintiff's use of the scooter. *Stitt,* 961 S.W.2d at 930; *Burns,* 854 S.W.2d at 457.

In yet another argument, O'Reilly insists that ELI assumed the duty, either by contract or by conduct, to protect Plaintiff from physical harm. To support that argument, O'Reilly cites to ELI's "Policy and Procedures Manual" which states that its mission is "**TO MAINTAIN A SAFE & HEALTHY ENVIRONMENT**" for its clients and that its "**PURPOSE IS TO PROTECT THE INDIVIDUAL FROM INJURY, DISEASE AND INFECTION.**" Also, O'Reilly points to testimony from an ELI employee to the effect that ELI considers the safety and well-being of individuals in its care "at all times." Continuing, O'Reilly insists "ELI knew or should known with minimal diligence" that Plaintiff had a developmental age of only six years and five months, functioned on a second grade level, had diffuse weakness in his extremities, suffered from cataracts, and had a history of falling and injuring himself; that these and other acts make it at least inferable that if the scooter tipped over, Plaintiff would be unable to adequately break a fall with his arms or hands. From this and other evidence, O'Reilly insists that at least two viable theories of negligence attend, i.e., RESTATEMENT OF TORTS (SECOND), § 323 [16] and negligent entrustment.[17]

O'Reilly insists that the "negligent entrustment" theory of negligence is viable because ELI had a duty to keep Plaintiff from having the scooter and it breached that duty by "entrusting" the scooter to Plaintiff. As to the RESTATEMENT theory, O'Reilly asserts that ELI assumed a duty to protect Plaintiff by requiring him to wear a helmet and that the breach of that

---

**16.** "One who undertakes, gratuitously, or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm, or
"(b) the harm is suffered because of the other's reliance upon the undertaking."

**17.** *See LeCave v. Hardy,* 73 S.W.3d 637, 640 (Mo.App.2002).

duty was the proximate cause of, or contributed to cause, Plaintiff's head injury. Those arguments fail because uncontroverted evidence shows ELI did not provide or furnish the scooter and, as repeatedly explained, ELI had no way of controlling or keeping Plaintiff off the scooter.

■ Even so, after thorough analysis, we find one duty that arguably could have been imposed on ELI to protect Plaintiff from physical harm. That would have been the possible duty to inform or warn Dr. Andrew and Medicaid personnel that Plaintiff should not have had access to a scooter. Assuming *arguendo* that ELI was under such a duty, then a genuine issue of material fact exists about whether ELI breached that duty when it helped Plaintiff get the scooter. However, the existence of the duty and the existence of a fact issue about its breach does not mean that the trial court erred in entering summary judgment for ELI. This follows because there is no genuine issue of material fact about causation, the third element of a negligence case.

■ To make a submissible case for contribution under a negligence theory, O'Reilly had to show (a) the existence of a duty in ELI to protect Plaintiff, (b) the failure of ELI to perform that duty, and (c) an injury to Plaintiff *resulting from* such failure. *Koerber v. Alendo Bldg. Co.*, 846 S.W.2d 729, 730[2] (Mo.App.1992) (citing *Scheibel v. Hillis*, 531 S.W.2d 285, 288 (Mo.banc 1976)). To establish the third element, i.e., causal connection between an allegedly negligent act and an injury, requires proof of two things: (1) causation in fact, and (2) proximate cause. *Koerber*, 846 S.W.2d at 730[5].

Many tests have been applied when considering causation in fact. One such test is the "but for" test, i.e., "the injury would not have happened but for the [defendant's] negligence," *Id.*, and the "substantial factor" test, i.e., defendant's "conduct is a substantial factor in bringing about the harm." *Hildreth v. Key*, 341 S.W.2d 601, 607[13] (Mo.App.1960). No matter what test is applied here, ELI was not the cause in fact of Plaintiff's injury.

To explain, we can find no causal connection between what ELI did to help Plaintiff get the scooter, or its failure to object to Plaintiff's acquisition of the scooter, and Toliver's action of driving into the scooter as Plaintiff tried to cross the street. Toliver's actions were independent of anything connected with the presence or use of the scooter at the accident site. A similar incident could have occurred whether Plaintiff was walking without any assistive device, or was using a different assistive device to get about, such as leg braces, or a walker, or crutches, or a cane. Accordingly, even assuming ELI breached a duty owed Plaintiff when it helped him get the scooter, or when it did not caution Dr. Andrew and Medicaid personnel against helping Plaintiff get the device, we hold as a *matter of law that such conduct* was not the cause in fact of the injury to Plaintiff. *See Koerber*, 846 S.W.2d at 731.[18]

---

18. We are confirmed in this view by the fact that O'Reilly only makes one argument concerning proximate cause or contributing cause, and it is this: "At minimum an unresolved fact question exists as to whether ELI's failure to require [Plaintiff] to wear protective headgear was the proximate cause or contributed to cause [Plaintiff's] injury. That issue should have been resolved by a jury. Here whether ELI's failure to require [Plaintiff] to wear protective headgear proximately caused the injury was not even presented as an uncontroverted fact by the moving party." We explained earlier that, as a matter of law, ELI had no duty to require Plaintiff to wear a helmet. O'Reilly's failure to make any argument on how ELI's alleged negligence in assisting Plaintiff to get the scooter was a direct

■ We hasten to acknowledge that ordinarily the question of causation is for the jury. *Heffernan v. Reinhold,* 73 S.W.3d 659, 665[16] (Mo.App.2002); *Koerber,* 846 S.W.2d at 731[6]. However, " 'under clear and compelling circumstances, the question becomes one of law for the courts.' " *Id.* at 731 (citation omitted). As this analysis shows, the "clear and compelling" circumstances spoken of in *Koerber* are present here. *See also, Heffernan,* 73 S.W.3d at 664–65.

For the reasons given, summary judgment was proper here.[19] Point denied.

The judgment of the trial court is affirmed.

BATES, C.J., and GARRISON, J., concur.

or proximate cause of Plaintiff's injury acts as a waiver of that issue.

19. In so holding, we do not ignore O'Reilly's claim that a fact dispute exists about whether ELI was negligent in not supplying Plaintiff with protective headgear. The problem for O'Reilly is that such claim is wholly unsupported by the record. What the record shows is that Plaintiff had a helmet, but refused to wear it. Plaintiff's excuse that he did not wear the helmet because it was too tight came in his post-accident deposition. *See* n. 6. There is no evidence ELI knew there was an alleged helmet size problem before the accident. Such post-accident testimony cannot be used to impose a duty on ELI to provide Plaintiff with a different sized helmet.