NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE
_____

VOTE SOLAR, *Appellant,*

*v.*

ARIZONA CORPORATION COMMISSION, *Appellee.*
_____

STATE OF ARIZONA, *Appellant,*

*v.*

ARIZONA CORPORATION COMMISSION, *Appellee.*
_____

THE ARIZONA SOLAR ENERGY INDUSTRIES ASSOCIATION and
SOLAR ENERGY INDUSTRIES ASSOCIATION; DIANE BANET;
MICHAEL SELF, *Appellants,*

*v.*

ARIZONA CORPORATION COMMISSION, an Agency of the State of
Arizona, *Appellee.*
_____

THE ARIZONA SOLAR ENERGY INDUSTRIES ASSOCIATION; SOLAR
ENERGY INDUSTRIES ASSOCIATION; DIANE BANET; MICHAEL
SELF, *Appellants,*

*v.*

THE ARIZONA CORPORATION COMMISSION, an Agency of the State
of Arizona, *Appellee.*
_____

ARIZONA PUBLIC SERVICE COMPANY, Intervenor


Nos. 1 CA-CC 25-0001
1 CA-CC 25-0002
1 CA-CC 25-0003
1 CA-CC 25-0004
(Consolidated)

FILED 06-16-2026

Appeal from the Arizona Corporation Commission
No. E-01345A-22-0144

**VACATED AND REMANDED**

COUNSEL

Arizona Center for Law in the Public Interest, Phoenix
By Chanele N. Reyes
*Co-Counsel for Appellant Vote Solar*

Earthjustice, Denver, CO
By Robert Rigonan (*pro hac vice*) (argued), David C. Bender (*pro hac vice*)
*Co-Counsel for Appellant Vote Solar*

Arizona Attorney General's Office, Phoenix
By Mary M. Curtin, Joshua M. Whitaker (argued), Andrew McCoy
*Counsel for Appellant State of Arizona*

Rose Law Group, PC, Scottsdale
By Court S. Rich, Logan V. Elia, Eric A. Hill
*Co-Counsel for Appellants Arizona Solar Energy Industries Association, Solar
Energy Industries Association, Diane Banet, Michael Self*

Arizona Solar Energy Industries Association, Scottsdale
By Autumn T. Johnson
*Co-Counsel for Appellants Arizona Solar Energy Industries Association, Solar
Energy Industries Association, Diane Banet, Michael Self*

Arizona Corporation Commission, Phoenix
By Thomas Van Flein (argued), J. Michael Dailey, Jr., Maureen A. Scott
*Counsel for Appellee Arizona Corporation Commission*

Osborn Maledon, P.A., Phoenix
By Mary R. O'Grady, Joseph N. Roth
*Co-Counsel for Intervenor Arizona Public Service*

Gibson, Dunn & Crutcher LLP, Washington, D.C.
By Thomas G. Hungar (*pro hac vice*), Matthew S. Rozen (*pro hac vice*)
(argued), Aaron M. Smith (*pro hac vice*)
*Co-Counsel for Intervenor Arizona Public Service*

—————————————————

**MEMORANDUM DECISION**

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which Judge D. Steven Williams and Judge Cynthia J. Bailey joined.

—————————————————

**K I L E Y**, Judge:

¶1        In this consolidated appeal, Arizona Solar Energy Industries Association and Solar Energy Industries Association (collectively, "AriSEIA"), Vote Solar, the State of Arizona (the "State"), Diane Banet, and Michael Self – whom we refer to collectively as "Appellants" – challenge a decision (the "Rehearing Decision") of the Arizona Corporation Commission (the "Commission") on rehearing of the provisions of a prior decision (the "Rate Decision") that authorized Arizona Public Service Company ("APS") to impose an additional charge on APS customers whose homes are equipped with solar technology that supplies part of their electricity needs. Appellants contend, among other things, that the proceedings that culminated in the Commission's decision to authorize the solar-specific charges were conducted in violation of due process, and that the rehearing did not cure the due process violation. We agree, and so (1) vacate the Rehearing Decision and the provisions of the Rate Decision authorizing the solar-specific charges and (2) remand for further proceedings consistent with this decision.

## FACTS AND PROCEDURAL HISTORY

¶2        APS is a public service corporation owned and operated by Pinnacle West Capital Corporation, a private company.

¶3          The Commission is a constitutionally-created entity charged, among other things, with setting the rates that utilities and other public service corporations may charge their customers.[1] Ariz. Const. art. 15, § 3. Courts have long recognized that a utility's revenue "should be sufficient to meet [its] operating costs and to give [it] and its stockholders a reasonable rate of return on the utility's investment." *Scates v. Ariz. Corp. Comm'n*, 118 Ariz. 531, 533-34 (App. 1978). At the same time, a utility's rates may not exceed an amount that is "just and reasonable," nor may a public service "discriminat[e] . . . between persons" in "charges made . . . for rendering a like and contemporaneous service[.]" Ariz. Const. art. 15, § 12.

¶4          The Commission determines rates by conducting proceedings known as "rate cases," *see* Ariz. Admin. Code ("A.A.C.") R14-2-103, which are often complex matters that "attract many intervenors, require voluminous and detailed filings, and involve multiple, lengthy hearings." *Residential Util. Consumer Office v. Ariz. Corp. Comm'n*, 240 Ariz. 108, 110, ¶ 6 (2016). Rate-setting is a two-step process: the Commission first determines the amount of revenue to which the utility is entitled, and then allocates the revenue collection among the utility's customer classes. *See Freeport Minerals Corp. v. Ariz. Corp. Comm'n*, 244 Ariz. 409, 411, ¶¶ 7-8 (App. 2018).

¶5          When applying for a rate change, a utility is required to submit a cost-of-service study ("COSS") for customer classes on which it seeks to raise rates. A.A.C. R14–2–103(G). A COSS is a study that compares a utility's costs of serving each customer class with the rates each class pays. Different methodologies may be used when preparing a COSS, which necessarily incorporates the judgment of the person who prepared it in determining the costs to be assigned to the various customer classes. *See*

---

[1] Public service corporations are

> [a]ll corporations other than municipal engaged in furnishing gas, oil, or electricity for light, fuel, or power; or in furnishing water for irrigation, fire protection, or other public purposes; or in furnishing, for profit, hot or cold air or steam for heating or cooling purposes; or engaged in collecting, transporting, treating, purifying and disposing of sewage through a system, for profit; or in transmitting messages or furnishing public telegraph or telephone service, and all corporations other than municipal, operating as common carriers[.]

Ariz. Const. art. 15, § 2.

*Freeport*, 244 Ariz. at 412, ¶ 9. A "delivered-load COSS," for example, measures customers' cost of service during the test year based on their delivered load, *i.e.*, the amount of electricity that the utility supplies to those customers. A "site-load COSS," by contrast, measures customers' site-load, *i.e.*, the total amount of electricity they use, including self-generated electricity.

**¶6**        Although a COSS is the "starting point" for allocating a utility's revenue requirement among customer classes, the regulatory body may consider economic, social, and other factors in rate-making decisions as well. *Freeport*, 244 Ariz. at 412, ¶¶ 8, 10.

I.        **Prior Rate Cases Initiated By APS**

**¶7**        In a rate case initiated in 2013, APS sought approval for a charge specific to residential solar customers, asserting that they paid less than their fair share of APS's fixed costs to service its customers. The Commission approved the proposed solar-specific charge. In a rate case initiated in 2016 (the "2016 Rate Case"), the Commission authorized APS to continue to impose the solar-specific charge, which the Commission dubbed a "Grid Access Charge" ("GAC").[2]

**¶8**        In the next rate case (the "2019 Rate Case"), however, the Commission directed APS to discontinue the GAC, determining that APS had failed to justify it with "evidence of any specific and unique costs" that residential solar customers "impose on APS's system[.]" "Under state and federal law," the Commission stated, "a utility may not discriminate against" residential solar customers, and so "must justify any difference in" charges applied to solar and non-solar customers "based on accurate data and consistently applied cost-allocation principles[.]" Here, the Commission determined, "the record contains no such evidence that might justify treating [residential solar] customers differently," and so APS must "eliminate" the GAC.

**¶9**        When it directed APS to eliminate the GAC at the end of the 2019 Rate Case, the Commission did not rule out re-imposing a solar-specific charge in the future. Instead, the Commission determined that

---

[2] The 2016 Rate Case also changed the manner in which APS compensated solar customers for electricity that they generated and exported to the grid. The change did not apply to existing solar customers, however, who were grandfathered in under the old method, and are referred to as "legacy solar customers."

imposing unique charges on residential solar customers may be justified if APS presented "evidence of specific costs" that residential solar customers "impose[] . . . on APS's system" that non-solar customers do not. The Commission therefore directed APS to conduct and submit, in "its next rate case[,]" an analysis that "identif[ies]" and "quantif[ies]" the "extra costs" that "APS incurs specifically to serve [residential solar] customers[.]" Specifically, the Commission directed APS to prepare and submit both a site-load COSS and a delivered-load COSS which "clearly include[] and identif[y]" the "extra costs" that APS incurs to "provide service to" residential solar customers.

## II.     **The Current Rate Case**

### A.     **APS Proposed a Uniform Rate Increase for Solar and Non-Solar Residential Customers.**

¶10         In October 2022, APS initiated a new rate case (the "Current Rate Case") by filing an application seeking a modification of "current rates and charges" to enable APS "to earn a fair return on the fair value of its assets devoted to public service[.]" To eliminate an annual "revenue deficiency of $772 million[,]" APS sought approval of a base rate increase of 22.9% as well as other adjustments and revenue transfers.

¶11         APS's application proposed a uniform rate increase of 22.8% for all residential customers, solar and non-solar alike. Expressing an intent "to keep residential rate structure changes to a minimum," APS proposed only two other, relatively minor changes affecting residential customers: the elimination of certain payment fees, "including credit card fees and in-person kiosk fees[,]" and the addition of two federal holidays to existing time-of-use rate plans.

¶12         As instructed by the Commission at the conclusion of the 2019 Rate Case, APS submitted, with its application in the Current Rate Case, a site-load COSS and a delivered-load COSS.[3] APS contended that its site-load COSS established that residential solar customers were underpaying for the service they received. APS did not dispute that residential solar customers, like non-solar customers, pay for the electricity they receive from APS. According to APS, however, residential solar customers impose an additional burden on APS that non-solar customers do not. APS explained that residential solar customers will look to APS to supply their

---

[3] APS also submitted a third COSS that received little attention during the proceedings and is not relevant here.

electricity needs if their own solar generation systems were to fail due to such factors as equipment outage or adverse weather conditions. Although, APS asserted, it must maintain additional capacity in reserve to meet residential solar customers' full site-load needs, those customers do not bear the cost of maintaining this reserve capacity. Instead, the cost to maintain this additional capacity was distributed throughout APS's entire customer base. Residential solar customers are the reason APS needs to maintain this additional capacity at the ready in case it's needed, APS concluded, but residential solar customers did not compensate APS for the financial burden of providing them with this resource adequacy.

¶13        APS did not, however, ask the Commission to rely on the site-load COSS in setting rates, nor did it otherwise propose imposing an additional charge on residential solar customers. On the contrary, APS asked the Commission to take the site-load COSS into account only in "*future* rate case proceedings (emphasis added)."

¶14        In December 2022, APS provided notice to the public of its initiation of the Current Rate Case by mail, email, publication, and on its website. APS's notice (the "Public Notice") outlined APS's proposals, reflecting, among other things, that APS proposed a uniform 22.8% rate increase for all residential customers. The Public Notice identified the only other proposed rate design changes affecting residential customers as follows:

> APS proposes to eliminate credit card fees and in-person kiosk fees and to provide two additional off-peak holidays for time-of-use rate plans.

The Public Notice said nothing, in other words, about a rate increase that would apply only to solar residential customers.

¶15        The Public Notice also provided that

> NEITHER THE COMMISSION'S UTILITIES DIVISION ("STAFF") NOR ANY INTERVENOR HAS YET MADE ANY RECOMMENDATION REGARDING APS'S APPLICATION. THE COMMISSION IS NOT BOUND BY THE PROPOSALS OF COMPANY, STAFF, OR ANY INTERVENORS. THE COMMISSION WILL DETERMINE THE APPROPRIATE RELIEF TO BE GRANTED IN RESPONSE TO APS'S APPLICATION BASED ON THE EVIDENCE PRESENTED IN THIS MATTER. THE FINAL RATES APPROVED BY THE COMMISSION MAY BE HIGHER, LOWER, OR DIFFERENT

THAN THE RATES PROPOSED BY COMPANY OR BY OTHER PARTIES.

¶16        Over the course of the proceedings, APS modified some of its proposals. At no time, however, did APS propose a solar-specific charge, or otherwise modify its request for a uniform rate increase for all residential customers.

¶17        After granting intervention requests filed by Vote Solar, AriSEIA, the Residential Utility Consumer Office ("RUCO"), and over thirty other parties (including local and tribal governmental entities, industry associations, and environmental advocacy groups), administrative law judge Sarah Harpring scheduled evidentiary proceedings to begin in August 2023.

B.        **The Initial Proceedings Culminated in the Rate Decision, Which Authorized APS to Impose a Solar-Specific Charge.**

¶18        Evidentiary proceedings were conducted over 24 days in August and September 2023. During the proceedings, APS presented testimony and other evidence in support of its proposals.

¶19        Two of APS's witnesses, Justin M. Joiner, its Vice President of Resource Management, and Jamie Moe, its Manager of Regulatory Affairs, testified extensively about "resource adequacy," which refers to a utility's obligation "to maintain sufficient system resources to meet customer energy needs during reasonably foreseeable system peak load conditions." Joiner testified, among other things, about the challenges APS faces in "ensur[ing]" that "there are sufficient resources to serve customers during peak conditions." In his testimony, Moe compared APS's site-load COSS with its delivered-load COSS, asserting that the former better reflects "the costs that [APS] incurs to serve the solar customer" than the latter because the former includes the total amount of electricity used at individual residences, *i.e.*, the electricity delivered by APS as well as the electricity generated on-site. Even though solar customers self-generate electricity, Moe opined, they still rely on APS "to provide back-up power" sufficient "to serve their entire load" when their rooftop solar systems fail due to "equipment outage" or "cloud cover."

¶20        APS did not, however, propose imposing an additional charge on residential solar customers for the resource adequacy benefit they purportedly receive. On the contrary, throughout the proceedings APS maintained its request for a uniform rate increase applicable to all residential customers. During the evidentiary proceedings, counsel for APS

expressly stated that APS "supports . . . spreading" its requested residential rate increase "evenly" across "customer classes."

**¶21** And although Moe testified that the site-load COSS accurately reflected APS's costs to serve its residential solar customers, APS did not ask the Commission to adopt its site-load COSS in the Current Rate Case. Instead, during the evidentiary proceedings, APS reiterated the request that it made in its initial application that the Commission adopt its site-load COSS for use only "in *future* rate case proceedings." (emphasis added). When Judge Harpring asked Moe directly whether APS was "proposing that its rates in this case be modified in accordance with any of its Cost of Service Study results," he replied, "No, I do not believe so."

**¶22** In his testimony, the Commission's expert witness, Dr. David Dismukes, recommended that "the Commission reject APS's proposed increase" for residential customers, urging the Commission to "limit[] the rate increase to any single customer class by 1.15 times the overall system average increase."

**¶23** After taking the matter under advisement, Judge Harpring issued a Recommended Opinion and Order (the "First ROO") that recommended that some, but not all, of APS's proposals be adopted. Judge Harpring also recommended something no one asked for: she recommended that the Commission reject APS's proposal for a uniform rate increase for all residential customers and, instead, approve APS's site-load COSS for use in the Current Rate Case and authorize APS to implement "an additional charge" that would apply "only" to residential solar customers. Citing extensively from the testimony about resource adequacy offered by Joiner and Moe, Judge Harpring stated that because "APS provides [residential solar] customers" with "energy when they need it," "it is . . . just and reasonable to allocate costs of service to [residential solar] customers based on their site load." Evidently accepting Dr. Dismukes's caution against raising residential rates by more than 15%, Judge Harpring recommended an additional charge, to be imposed on residential solar customers, that would increase their rates by 15% more than the rates charged to non-solar residential customers.

**¶24** Vote Solar and AriSEIA filed exceptions to the First ROO. AriSEIA argued, *inter alia*, that it was "blindsided" by Judge Harpring's recommendation of solar-specific rate increases for residential customers because APS never "proposed" such a charge, nor was it ever "discussed" during the evidentiary proceedings. The Commission cannot properly impose a solar-specific charge, AriSEIA maintained, "that no one sought

and no party had a motivation or reason to refute with evidence." Vote Solar argued, *inter alia*, that imposing a solar-specific charge "based on hypothetical energy deliveries" that residential solar customers may or may not need, depending on whether their rooftop solar systems ever go out, was "arbitrary" and not supported by "evidence in the record."

¶25 After a public hearing in March 2024, the Commission voted to issue Decision No. 79293 (the "Rate Decision") that largely adopted and approved the recommendations in the First ROO, including the recommendations to adopt the site-load COSS and authorize APS to impose an additional rate increase on residential solar customers. In so ordering, the Commission acknowledged that the site-load COSS that APS submitted with its application in the Current Rate Case did not constitute the "analysis" that the Commission directed APS to provide at the end of the 2019 Rate Case. The Commission explained that its orders at the end of the 2019 Rate Case "envisioned" that, in the next rate case, APS would "specifically analyz[e] and identify[] the services that it provides to [residential solar] customers" as "compar[ed]" to "the services provided to" residential non-solar customers. The Commission would have used that information, it stated, to determine "what additional efforts and/or equipment APS must use to ensure reliable service to [residential solar] customers that it does not also use to ensure reliable service to" residential non-solar customers. Neither the site-load COSS nor the delivered-load COSS provided that information. On the contrary, the Commission concluded, "[t]he evidence of record . . . makes it clear that APS does not truly provide additional services and does not use additional equipment to serve [residential solar] customers."

¶26 Although the Commission determined that APS does not provide any unique services to residential solar customers, the Commission nonetheless authorized APS to impose a unique charge on those customers. In so determining, the Commission quoted Judge Harpring's statement that "allocat[ing] costs of service to [residential solar] customers based on their site load" would be "just and reasonable." Relying on data purportedly gleaned from the site-load COSS, the Commission determined the sums that residential solar customers pay for "their delivered load" fall short of compensating APS for "the capacity and other resources that [it] must have at the ready to provide" electricity to solar customers in case their home solar energy systems "fail[ed]." Concluding that "it is just and reasonable to allocate costs of service to [residential solar customers] based on their site-load[,]" the Commission authorized APS to impose "an additional charge" on residential solar customers equal to "approximately 1.15 times the system average increase." Although the Rate Decision did not use the

terms "GAC" or "legacy adjustment," APS later used the former to refer to the 15% additional charge imposed on APS's non-legacy residential solar customers and the latter to refer to the additional charge as it applied to legacy residential solar customers.

¶27        Commissioner Tovar dissented from the Rate Decision, citing, among other things, due process concerns in "approv[ing] an additional solar-specific charge to residential rooftop solar customers" that was not "mention[ed]" in the Public Notice and that "no party in the case recommended."

### C.        The Commission Granted a Rehearing.

¶28        AriSEIA and Vote Solar requested rehearing of the Rate Decision's approval of the solar-specific rate increase. In its request, AriSEIA asserted that "[a]dopting the proposed solar charge that was only proposed by the Commission after the close of the evidentiary record, without notice to the public and without taking evidence on the charge[,] violate[d] AriSEIA's due process rights[.]" Vote Solar took a similar position. Using the term "GAC" to refer collectively to the 15 percent additional charge imposed on "both" legacy and non-legacy solar customers, Vote Solar asserted that "the introduction of the GAC" at the end of the proceedings "violate[d] parties' due process rights."

¶29        At this point, the State joined the Current Rate Case as an intervenor, applying for rehearing under A.R.S. § 40-253(A) on the basis, *inter alia*, that the imposition of the solar charge without notice "violated parties' due process rights to meaningfully participate in the [Current Rate Case]."

¶30        Self, a legacy solar customer, and Banet, a non-legacy solar customer, also applied for leave to intervene, which the Commission granted. Self and Banet then urged the Commission to grant a rehearing of the Rate Decision, maintaining that the imposition of the GAC and the legacy adjustment came as a "surprise" to residential solar customers.

¶31        The State, Vote Solar, and other intervenors requested rehearing of other aspects of the Rate Decision as well.

¶32        The Commission denied most of the rehearing applications. But stating that it found Appellants' "assertion that the GAC was included within the [Rate Decision] without a full opportunity to be heard and present evidence . . . to be persuasive[,]" the Commission issued an order (the "Rehearing Order") granting a rehearing "limited to the issues

pertaining to the adoption of the GAC[.]" Defining the term "GAC" as "interchangeable" with "solar charge," the Rehearing Order stated that the Commission would rehear "whether the GAC rate is just and reasonable," whether imposing the GAC was "discriminatory," and whether the "omission of a GAC" would be "discriminatory to non-solar customers."

### D. The Rehearing Proceedings Culminated in the Rehearing Decision, Which Affirmed the Rate Decision's Approval of the Solar-Specific Charge.

¶33 Notwithstanding the contrary positions it took during the initial proceedings, APS defended the Rate Decision's adoption of the site-load COSS in the Current Rate Case and its authorization of solar-specific charges.

¶34 Before the rehearing's evidentiary proceedings began, disputes arose between the parties about the proper scope of the rehearing. Among other things, the parties disputed whether the validity of the site-load COSS was to be reheard. Appellants maintained that because APS's site-load COSS was the evidentiary basis for the solar-specific charges, the validity of the site-load COSS was necessarily within the scope of the rehearing too.

¶35 Likewise, the parties disputed whether the appropriateness of the legacy increase that was imposed on legacy solar customers, as well as the GAC that was imposed on non-legacy solar customers, was to be reheard. Appellants argued that it was. Although the Rehearing Order used the term "GAC," Appellants noted that the order defined the term to be "interchangeable" with the general term "solar charge." Appellants therefore asserted that the Rehearing Order reflected the Commission's intent to rehear both the GAC and the legacy adjustment.

¶36 APS took a far narrower view of the rehearing's scope. According to APS, the Rehearing Order's use of the term "GAC" indicated that the Commission intended to grant rehearing only on the solar-specific charge imposed on non-legacy solar customers, not the solar-specific charge on legacy solar customers. Likewise, because the Rehearing Order made no express reference to the site-load COSS, APS asserted that the validity of the site-load COSS was not open for reconsideration during the rehearing.

¶37 To resolve the impasse, both sides filed motions with the administrative law judge assigned to conduct the rehearing, Belinda A. Martin, seeking clarification of the issues to be addressed at the rehearing. APS asked Judge Martin to determine that the Rate Decision's "adoption of

APS's site-load solar COSS" was "outside the scope" of the rehearing. In response, the State argued that a rate increase specifically applicable to "solar . . . residential ratepayers" could "only" be justified when their "cost of service is assessed on a site-load basis." Because the site-load COSS was "a necessary predicate to adopting a solar-specific charge[,]" the State reasoned, an evaluation of the validity of APS's site-load COSS was a necessary component of a rehearing of the decision to approve that charge.

¶38        In a ruling issued in July 2024, Judge Martin sided with APS. Noting that "[t]he Rehearing Order makes no mention of relitigating the site-load COSS adopted by the Commission in [the Rate Decision]," Judge Martin ruled that the Commission's "adopt[ion of] the site-load COSS in [the Rate Decision] . . . constituted a final order of the Commission" that "may not be collaterally attacked in this rehearing proceeding." Rather confusingly, however, Judge Martin's July 2024 ruling also stated that, "[i]n the interest of fairness and to develop an accurate and complete record, it is reasonable to allow the parties to address the site-load COSS and its relationship to and impact on the GAC."

¶39        When the Commission finalized the rehearing schedule at its August 2024 public meeting, the Commission's chair, Jim O'Connor, stated that the site-load COSS "was accepted during the [initial] rate case proceedings" and so would not be revisited during the rehearing.

¶40        Meanwhile, AriSEIA filed a request asking Judge Martin to clarify that the rate increase "levied on all solar customer[s,]" *i.e.*, both legacy and non-legacy solar customers, was "at issue in [the] rehearing." "The increased charges on all solar customers arise out of the same facts and circumstances[,]" AriSEIA argued, and challenges to the validity of the solar rate increase were "no more or less applicable to one set for customers versus the other." The State echoed AriSEIA's position, asserting that "the due process problems that necessitated a rehearing" in the first place apply "equally" to legacy and non-legacy solar customers.

¶41        In response, APS asserted that Appellants' "challenge to legacy solar rates falls outside the scope of this rehearing[.]" APS nonetheless urged Judge Martin to defer ruling on the issue until after the evidentiary proceedings were complete. According to APS, "[t]here [was] . . . no immediate need at this stage . . . to determine whether legacy solar rates are within the scope of the Rehearing Order." Instead, APS argued, "the better course" would be to defer ruling on whether the legacy adjustment was within the scope of the rehearing until the rehearing's evidentiary proceedings concluded. APS promised that it would "not seek[]

to prevent [Appellants] from making a full record" during the evidentiary proceedings "regarding . . . APS's rate increase [for] customers paying legacy solar rates." "[H]olding a full hearing" that includes the legacy adjustment, APS argued, "will best facilitate a decision by the Commission should it ultimately agree with [Appellants] on the Rehearing Order's scope."

¶42 Based on APS's assurances that it would "not object" to Appellants' presentation of evidence in opposition to the legacy adjustment, Judge Martin accepted APS's proposal to wait until "after the rehearing is complete" to determine "whether Legacy Solar rates are within the scope of the Rehearing Order." Judge Martin deferred ruling on the scope of the rehearing, in other words, until after the evidentiary proceedings were over.

¶43 In filings before the rehearing's evidentiary proceedings began, the parties also disputed the allocation of the burden of proof. AriSEIA asserted that the rehearing "is quite literally a do-over of the [initial] hearing as it pertains to the solar charge." As "the applicant for a rate increase," AriSEIA maintained, APS "bear[s] the burden[,]" at the rehearing, of proving that the solar-specific charges were "just and reasonable." The State likewise argued that the burden of proof rested on APS to justify the imposition of the solar-specific charges, asserting that in a rate case the utility always bears the burden of justifying a rate increase.

¶44 APS disagreed. Acknowledging that it "bore the burden as the applicant in the initial ratemaking [proceedings]," APS insisted that once the Commission issued the Rate Decision accepting the site-load COSS and approving the solar-specific charges, APS had "no legal obligation to further justify" the Rate Decision. Because Appellants were "the parties seeking changes" to the Rate Decision, APS maintained, Appellants bore "the burden to show that any changes are warranted." The Commission staff sided with APS, taking the position that "[t]he burden of proof in a rehearing proceeding" always "lies with the party seeking the rehearing."

¶45 Without resolving the parties' dispute over the burden of proof, Judge Martin issued a procedural order in August 2024 setting forth the schedule for the evidentiary proceedings and directing the parties to submit their pre-filed written testimony by September 24, 2024.

¶46 The rehearing's evidentiary proceedings were conducted over six days in October and November 2024.

¶47 The parties presented evidence about the validity of APS's site-load COSS and the justification for imposing additional charges on residential solar customers based on the resource adequacy benefit APS purportedly provides to them.

¶48 As relevant here, the State's expert, Dr. Richard McCann, disputed the site-load COSS's methodology, testifying that although residential solar customers' self-supply allows APS to avoid certain "generation and transmission and distribution" costs, the site-load COSS makes no attempt to "assess" the benefits that APS derives from "the presence of . . . rooftop solar."

¶49 Vote Solar's Regulatory Director Kate Bowman similarly testified that the site-load COSS "is not based on accurate data" because, *inter alia*, it fails to account for "the value to APS of load reductions when [residential solar customers] self-serve their own loads[.]" Accounting for the benefit that APS derives from residential solar generation, she stated, would require "different methodologies" and "data." When APS's counsel asked Bowman if she proposed any specific modifications to the site-load COSS, Bowman stated that she did not because of the limits the Commission had previously placed on the scope of the rehearing. "I haven't recommended" any specific modifications to the site-load COSS, she stated, because "I understood that the Commission" was not "interest[ed] in . . . changing or amending . . . the cost of service study."

¶50 RUCO, too, expressed uncertainty about the validity of the site-load COSS. In his written testimony submitted before the evidentiary proceedings, RUCO analyst Bentley Erdwurm opined that the site-load COSS "does not present" cost metrics for solar customers "in the same format used to analyze cost metrics for other classes[,]" and therefore "RUCO cannot definitively say whether [the site-load COSS] supports or weighs against implementation of the GAC." RUCO did not, however, attempt to make a more conclusive assessment of the validity of the site-load COSS because Judge Martin had ruled that its validity was outside the scope of the rehearing. As Erdwurm stated, "RUCO respects [Judge Martin's] conclusion set forth in her [July 2024 order] that the [site-load COSS's] findings are final."

¶51 When asked for his views on "rethinking" the methodology used to determine solar customers' "cost of service," the Commission's expert, Dr. Dismukes, admitted that he had not considered the issue because he believed it was not "within the scope of the things that the ALJ and the Commission would be considering here." He expressly declined to

opine, however, that alternative methodologies lacked merit. "[I]t wasn't that there weren't merits to those things[,]" he stated. "It was just the fact that I thought" that the rehearing "was limited . . . in . . . scope."

¶52 In addition to challenging the validity of the site-load COSS, the State raised a more fundamental objection to the Commission's reliance on it: according to the State, even if accepted as valid, the site-load COSS does not actually support the Rate Decision's conclusions about resource adequacy for residential customers. The State maintained that APS's cost to serve residential solar customers, including the "back-up costs for production capacity," are reflected in APS's delivered-load COSS, not its site-load COSS. The Rate Decision was analytically flawed, the State argued, because its findings about resource adequacy for solar customers "improperly borrow[] from the analysis underpinning" the delivered-load COSS even though, in the Rate Decision, the Commission rejected the delivered-load COSS in favor of the site-load COSS. APS disputed the State's position, accusing the State of "misunderstand[ing] the relationship between" the site-load COSS and the delivered-load COSS. But when Dr. McCann attempted to explain the State's position that the Rate Decision is internally inconsistent because it simultaneously rejected the delivered-load COSS while relying on data derived from it to calculate the solar-specific charges, Judge Martin cut him off. The delivered-load COSS was not within the scope of the rehearing, and so Judge Martin directed McCann to "move away from [the] delivered load discussion."

¶53 Although Appellants presented evidence and arguments in support of their challenge to APS's site-load COSS, they were not able to cross-examine Joiner, one of APS's principal resource adequacy witnesses, on the matter. Joiner, it turns out, had left APS's employ after the initial proceedings but before the rehearing. Noting that Appellants had "no opportunity to cross-examine" Joiner on "the appropriateness" of using "his testimony" to justify "an additional charge on solar customers[,]" counsel for Banet and Self asked Judge Martin to "either" strike the testimony Joiner gave at the initial proceedings or require APS to designate another witness who would "adopt" Joiner's testimony and be subject to cross-examination about it.

¶54 APS's counsel objected to striking Joiner's testimony from the initial proceedings. "Mr. Joiner's testimony is in the record[,]" APS's counsel insisted, "[a]nd it can be relied upon by" Judge Martin "in making a decision." APS's counsel further asserted that if Appellants had questions "that bear upon how Mr. Joiner's testimony" from the initial proceedings "is relevant here," other APS witnesses could answer them. APS's counsel

identified APS's Rate Administration Manager Hart McClain as the witness who would testify about the matters Joiner addressed in his testimony during the initial proceedings.

**¶55**        Judge Martin agreed with Banet and Self that Joiner did not testify about resource adequacy in the context of residential solar customers when he testified during the initial proceedings, and that he was not available to be cross-examined about that issue during the rehearing. Judge Martin nonetheless declined to strike Joiner's testimony from the initial proceedings. Instead, she accepted APS's suggestion that McClain serve as a substitute for Joiner, stating that she would "take anything that Mr. McClain testifies to as having come from Mr. Joiner[.]" In effect, Judge Martin determined that Appellants' cross-examination of McClain at the rehearing would serve as an adequate substitute for cross-examination of the now-unavailable Joiner.

**¶56**        During subsequent questioning, however, McClain expressly declined to adopt Joiner's testimony as his own, and proved unable to answer questions about Joiner's prior testimony.[4]

**¶57**        In the recommended order (the "Second ROO") she issued after the evidentiary proceedings were complete, Judge Martin recommended that the disputed portions of the Rate Decision "remain in full force and effect." The validity of the GAC was the only issue to be addressed at the rehearing, she stated, and so neither the site-load COSS nor the legacy adjustment were subject to being relitigated. Nonetheless, Judge Martin stated, Appellants were given an opportunity to present evidence and argument "to create a record" in support of their challenge to

---

[4] In written testimony filed at the rehearing, for example, McClain cited Joiner's prior testimony for the proposition that APS "requires transmission development to deliver" resources to meet the increased customer demand after solar production declines at sundown. When, on cross-examination, McClain was asked to explain this statement, he simply referred back to Joiner's testimony. When asked whether residential solar customers "add" to APS's "need" for "additional transmission resources," McClain stated, "I was going off of what Mr. Joiner said." When asked to explain his assertion that residential solar generation "increase[s] [APS's] need to develop additional transmission resources[,]" McClain again stated, "I was relying on Mr. Joiner's testimony." McClain, in other words, echoed Joiner's statements on direct examination but proved unable, on cross-examination, to explain them.

the site-load COSS and the legacy adjustment. As a result, Judge Martin concluded, the rehearing cured any deficiencies in the initial proceedings. "Having had the opportunity to provide such evidence," Judge Martin found, "any due process concerns (if, indeed, there were due process inadequacies) have been addressed and cured."

¶58         Judge Martin also stated that she had considered all of the evidence that Appellants presented – even the evidence on issues that were purportedly outside the scope of the rehearing – and found it insufficient to justify modifying the provisions of the Rate Decision approving the solar-specific charges. And ruling, for the first time, that the burden of proof rested with Appellants, Judge Martin recommended that the Commission find that Appellants failed to meet their burden of justifying a modification to the disputed provisions of the Rate Decision.

¶59         At a public hearing in December 2024, the Commission voted to approve the Rehearing Decision, which adopted the Second ROO and re-affirmed the Rate Decision's authorization of an additional solar-specific charge on APS's residential solar customers. Acknowledging that Appellants "presented evidence at the rehearing" showing that the site-load COSS fails to accurately reflect costs that APS incurs in serving residential solar customers, the Commission rejected Appellants' evidence on the basis that the validity of the site-load COSS had already been determined in the Rate Decision, and that determination was "not subject to reconsideration in this proceeding." At a later point in the Rehearing Decision the Commission addressed the merits of the evidence presented by Appellants, "find[ing] that the testimony and analysis [Appellants] presented at rehearing" to be "no more reliable than" the evidence presented "in the underlying case."

¶60         The Commission concluded the Rate Decision by stating that, "after consideration of the evidence presented in both the original proceeding and the rehearing," it found that "[t]he imposition of the GAC and the adjustment to Legacy Solar base rates are supported by the evidence" as well as "just" and "reasonable."

¶61         Commissioner Tovar dissented from the Rehearing Decision.

¶62         Appellants each applied for rehearing. Because the Commission did not grant any of the applications within twenty days, they were deemed denied by operation of law. *See* A.R.S. § 40-253(A). Appellants then separately appealed the Rehearing Decision and we consolidated their

appeals. APS filed a motion to intervene in this Court, which we granted. We have jurisdiction pursuant to A.R.S. § 40-254.01(A).

## DISCUSSION

I.  **The Adoption of the Solar-Specific Charges Did Not Comport with Due Process.**

**¶63**        Appellants raise multiple arguments in support of their challenge to the Rehearing Decision's affirmation of the provisions of the Rate Decision that authorized APS to impose an additional 15% charge on legacy and non-legacy solar residential customers. According to Appellants, the Commission erred in approving the solar-specific charges because the charges (1) were approved in violation of Appellants' procedural due process rights; (2) are not "just and reasonable" as required by the Arizona Constitution, *see* Ariz. Const. art. XV § 12; (3) impermissibly discriminate against APS's residential solar customers in violation of federal and Arizona law, *see id.*; 16 U.S.C. § 824a-3(f)(1); and (4) violate federal statute, *see* 16 U.S.C. § 824a-3(f)(1). We need address only the first argument, because it is dispositive.

**¶64**        In support of their due process claim, Appellants argue, first, that the initial proceedings that culminated in the Rate Decision denied them adequate notice or a meaningful opportunity to be heard. In response, APS and the Commission (collectively, "Appellees") contend that the proceedings that culminated in the Rate Decision satisfied the requirements of due process.

**¶65**        Like "all governmental bodies," the Commission is "subject to constitutional constraints and requirements," *Sun City Home Owners Ass'n v. Ariz. Corp. Comm'n*, 252 Ariz. 1, 5, ¶ 16 (2021), including those imposed by the due process provisions of the federal and state constitutions. *See* U.S. Const., amend. XIV; Ariz. Const. art. 2, § 4; *see also Residential Util. Consumer Off. v. Ariz. Corp. Comm'n*, 199 Ariz. 588, 593, ¶ 22 (App. 2001) (recognizing that both the utility and the public are entitled to due process in ratemaking case). While "the Commission's decisions are entitled to a presumption of constitutionality[,]" that presumption does not extend to "issues of constitutional and statutory compliance[.]" *Sun City*, 252 Ariz. at 5, ¶¶ 17-18. On the contrary, whether the Commission complied with its due process obligations is a constitutional question which we review *de novo*. *See id.* at ¶ 18.

**¶66**        APS asserts that the Commission did not violate anyone's due process rights when it authorized the solar-specific rate increases in its Rate

Decision because, APS contends, the public was on notice that "a solar-specific charge was on the table" from "the very beginning" of the Current Rate Case. APS bases this assertion on language in the Public Notice stating that the Commission "is not bound by the proposals of company, staff, or any other intervenors" and that "the final rates approved by the Commission may be higher, lower, or different than the rates proposed by company or by other parties." *See supra* ¶ 18. According to APS, the Public Notice gave "solar customers . . . all the notice due process required."

**¶67** Due process is a flexible concept eluding precise definition. *See Lassiter v. Dep't of Social Services of Durham Cnty., N.C.*, 452 U.S. 18, 24 (1981); *see also Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961) ("The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."). "The touchstone of due process[,]" however, "is fundamental fairness[,]" *State v. Melendez*, 259 Ariz. 282, 290, ¶ 26 (2025) (citation omitted), and it requires, at a minimum, an "opportunity to be heard 'at a meaningful time in a meaningful manner'" before one is finally deprived of a property interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). A meaningful opportunity to be heard, in turn, requires notice that fairly apprises interested parties of the proposed action under consideration. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."); *see also Matter of Rights to Use of Gila River*, 171 Ariz. 230, 237-38 (1992) ("Due process . . . requires that the notice be of such nature as to reasonably convey the required information" to "make [interested parties] aware of the opportunity to present their objections." (citations omitted)). Absent meaningful notice of the proposed action under consideration, a party cannot be said to have been given "an adequate opportunity to present factual and legal claims fully." *Matter of Guardianship of A.K.*, 258 Ariz. 336, 343, ¶ 18 (App. 2024); *see also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("[The] right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest."). Here, nothing in the Public Notice suggested that a solar-specific charge was under consideration.

**¶68** To be sure, an adjudicative body does not have sole responsibility for providing the notice that due process requires. For that reason, when determining whether a proceeding complied with the requirements of due process, we look not only to hearing notices issued by the adjudicator, but to the pleadings, motions, and disclosures of the

contending parties. *See Bekins v. Huish*, 1 Ariz. App. 258, 263 (1965) (rejecting defendant's challenge to default judgment compelling specific performance of agreement to sell real property, and holding that the complaint's prayer for relief "was certainly reasonably calculated to apprise the defendant that the plaintiff claimed his entire ownership, if any, in this property and thus satisfies due process insofar as notice is concerned"); *cf. Clark Equip. Co. v. Ariz. Prop. & Cas. Ins. Guar. Fund*, 189 Ariz. 433, 440 (App. 1997) ("The purpose of disclosure is . . . to give each party adequate notice of what arguments will be made and what evidence will be presented[.]").

¶69            Had APS's application in the Current Rate Case proposed a solar-specific increase, we would have little trouble concluding that APS's application and the Public Notice, read together, provided notice sufficient to satisfy due process. But APS did not propose a solar-specific charge at any point during the initial proceedings. On the contrary, it proposed a uniform rate increase for all residential customers. Moreover, when APS submitted the site-load COSS, it expressly, and repeatedly, disclaimed reliance on it in the Current Rate Case, instead asking the Commission to consider it only in "*future* rate case proceedings." Because APS's application proposed a uniform rate increase and disclaimed reliance on the site-load COSS in the Current Rate Case, APS's application and the Public Notice, read together, did not provide meaningful notice that the Commission would adopt the site-load COSS and rely on it to authorize a solar-specific increase. *See Morrison v. Shanwick Int'l Corp.*, 167 Ariz. 39, 43 (App. 1990) ("The requirements of timely notice and meaningful opportunity to be heard certainly envision more than contemporaneous notice and opportunity to be heard on an unsuspecting and unprepared party."); *Sulger v. Ariz. Corp. Comm'n*, 5 Ariz. App. 69, 73 (1967) (holding that notice of issues to be addressed at hearing must be "reasonabl[y] definite" because affected party "must know against what he must defend.").

¶70            APS contends, next, that the history of recent rate-making cases made "clear that different rates for solar and non-solar customers were a real possibility."

¶71            At the conclusion of the 2019 Rate Case, the Commission directed APS to submit "more detailed cost-of-service studies in its next rate case, including 'a COSS using site load for residential solar customers, with the extra costs clearly included and identified.'" Interested parties should reasonably have known, APS contends, that "the Commission logically would use" the site-load COSS "to determine 'whether residential solar customers were paying a fair share of their cost of service . . .' and, if not, what to do about it."

¶72 We are not persuaded. When the Commission directed APS to discontinue the solar-specific charge in the 2019 Rate Case, the Commission cited the lack of evidence of unique costs that APS incurred in serving solar customers. Absent such evidence, the Commission indicated, imposing a solar-specific charge would impermissibly discriminate against solar customers in violation of state and federal law. The Commission directed APS to submit a COSS, in its next rate case, to "quantify" the "additional costs . . . that APS incurs specifically to provide service to [residential solar] customers . . . beyond the costs of providing their delivered power and energy." The Commission thus stated, at the end of the 2019 Rate Case, that it would consider re-authorizing a solar-specific charge only if APS presented evidence of unique costs it incurs to serve residential solar customers.

¶73 APS presented no such evidence when it initiated the Current Rate Case. On the contrary, after reviewing APS's site-load COSS and delivered-load COSS, the Commission expressly found that APS does not, in fact, "truly provide additional services and does not use additional equipment to serve [residential solar] customers." Because the Commission determined, at the end of the 2019 Rate Case, that the imposition of a solar-specific charge was contingent on evidence of solar-specific costs, and because, as the Commission found, APS presented no such evidence in the Current Rate Case, interested parties were not reasonably on notice that the Commission would authorize the re-imposition of a solar-specific charge anyway. *Western Gillette, Inc. v. Ariz. Corp. Comm'n*, 121 Ariz. 541, 543 (App. 1979) (noting that "all parties" to administrative proceedings "should have the opportunity to present evidence and argument on all issues involved, and that findings must be based exclusively on the evidence and on matters officially noticed."). Because the Commission expressly set forth, at the end of the 2019 Rate Case, the conditions that APS must meet before it would approve a solar-specific charge, the Commission could not properly disregard those conditions without first giving interested persons notice of its intent to do so. *See Gibbons v. Ariz. Corp. Comm'n*, 95 Ariz. 343, 346 (1964) (noting that the Commission "can rescind, alter or amend its orders and decisions only after an opportunity to be heard has been given to all persons affected").

¶74 Finally, APS argues that the requisite notice that the Commission might approve a solar-specific charge was supplied by testimony of the Commission's expert, Dr. Dismukes, during the initial proceedings. According to APS, Dr. Dismukes "recommended increasing solar customers' rates by '1.15 times the overall system average increase,' the exact increase underlying the [GAC] and Legacy Adjustment."

22

¶75        APS's description of Dr. Dismukes's recommendation is not wholly accurate. Although Dr. Dismukes recommended limiting residential rate increases to 15%, he did not recommend, or even mention, an additional charge applicable solely to residential solar customers. Nothing about Dr. Dismukes's recommendation that rate increases for both solar and non-solar residential customers be limited to 15% would have given interested parties any reason to expect the Commission to approve a solar-specific 15% rate increase.

¶76        Relief from the denial of procedural due process requires a showing of prejudice. *See, e.g., Matter of Guardianship of A.K.*, 258 Ariz. at 344, ¶ 26 ("[D]ue process errors require reversal only if a party is thereby prejudiced." (citation omitted)). Here, prejudice to Appellants from the due process violation is apparent from the record. Although APS argues that "Appellants had ample opportunity to litigate [the site-load COSS's] merits during the initial hearing," this is plainly not true; the State, Self, and Banet were not even parties to the initial proceedings. They did not seek to join the proceedings at that point because they had no meaningful notice that a solar-specific charge was under consideration. The fact that other parties with interests similar to theirs did, in fact, participate in the initial proceedings does not cure the violation of the due process rights of the State, Self, and Banet. As the State correctly argues, "due process rights belong to everyone[,]" and so "[a]n agency cannot satisfy due process by providing notice to only some of the people who will be affected" by the pending decision. *See Heinig v. Hudman*, 177 Ariz. 66, 70 (App. 1993) (holding that court violated wife's right to procedural due process by entering judgment against both spouses based on arbitration award entered after arbitration proceedings to which husband alone was a party).

¶77        The Commission argues that it cannot be faulted for providing insufficient notice of the solar-specific charges because the proceedings are fluid and proposals under consideration "may change" over the course of a proceeding. This is certainly true, and we do not suggest that due process requires the Commission, at the beginning of every rate case, to predict and then give notice of all potential outcomes or every conceivable decision the Commission might reach. Instead, we hold merely that because (1) the Commission, in the most recent prior rate case, directed APS to discontinue a solar-specific charge based on the absence of evidence of unique costs that solar customers impose on APS, (2) APS presented no evidence in the Current Rate Case of any unique costs that solar customers impose on APS, (3) APS never asked for a solar-specific increase in the Current Rate Case, (4) APS affirmatively requested a uniform rate increase for all residential customers, solar and non-solar

alike, and (5) APS expressly disclaimed reliance on the site-load COSS in the Current Rate Case, no interested observer would have had any reason to suspect that a solar-specific charge was even a potential outcome of the Current Rate Case. For all of these reasons, we hold that the initial proceedings that led to the Commission's approval of a solar-specific charge in the Rate Decision did not comport with due process.

II.     **The rehearing did not cure the due process deficiencies of the initial proceedings.**

¶78     Appellees argue that even if the proceedings that culminated in the issuance of the Rate Decision did not comport with due process, the rehearing proceedings cured any error. Describing the rehearing as "a second bite at the apple," Appellees argue that Appellants were afforded an opportunity to present whatever evidence they chose in support of their preferred outcome. As counsel for the Commission stated at oral argument before this Court, the rehearing "opened the door" for Appellants "to present their evidence," and the Commission "looked at" the "new evidence" and "found it wasn't persuasive." According to the Commission's counsel, the rehearing "cured, fully, any due process violation that could have happened" during the initial proceedings. As a result, Appellees contend, this Court must defer to the Commission's determination that the evidence and argument Appellants presented at the rehearing did not justify "upset[ting]" the Rate Decision.

¶79     For several reasons, we reject Appellees' argument that the rehearing cured the deficiencies in the original proceedings.

¶80     First, the record does not support Appellees' contention that Appellants were permitted to present all of their evidence to challenge the site-load COSS. As noted above, for example, Judge Martin cut Dr. McCann off when he tried to testify in support of the State's position that the Rate Decision was internally inconsistent because it rejected APS's delivered-load COSS while relying on data derived from it as evidentiary support for the solar-specific charges. *See supra* ¶ 52.

¶81     Likewise, as noted above, *see supra* ¶¶ 53-56, Appellants had no opportunity, during the rehearing, to cross-examine Joiner about resource adequacy as it applies to residential solar customers. When Joiner testified during the initial proceedings, the State, Self, and Banet were not parties to the case. Although Vote Solar and AriSEIA were parties at the time, they were not on notice that Judge Harpring might use Joiner's testimony as a basis for recommending solar-specific charges for residential

customers. Because Joiner was no longer available for cross-examination, his testimony from the initial proceedings could not properly be considered at the rehearing. *See Victaulic Co. v. Am. Home Assurance Co.*, 20 Cal.App.5th 948, 980 n.13, 229 Cal.Rptr.3d 545, 569 n.13 (2018) ("Where a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony on direct." (citation omitted)); *Fuller v. State*, 871 S.E.2d 79, 87 (Ga. App. 2022) ("[W]hen a witness declines to answer on cross-examination certain pertinent questions relevant to a matter testified about by the witness on direct examination, all of the witness'[s] testimony on the same subject matter should be stricken." (citation omitted)); *cf. State v. Robison*, 125 Ariz. 107, 110 (1980) (holding, in a criminal case, that the trial court erred in refusing to strike the direct examination testimony of a witness who refused to answer questions on cross-examination; "The state may not use a witness['s] direct testimony without an opportunity to confront the witness and cross-examine him."). But when Banet and Self moved to strike his testimony, APS objected, insisting that Joiner's testimony could properly "be relied upon by" Judge Martin "in making a decision." Judge Martin erroneously sustained APS's objection and declined to strike Joiner's testimony despite his unavailability for cross-examination.

**¶82** In lieu of striking Joiner's testimony, Judge Martin stated that she would treat testimony given at the rehearing by a different APS witness, McClain, "as having come from Mr. Joiner." Appellees cite no authority, and we are aware of none, for the proposition that an adjudicator may unilaterally attribute one witness's testimony to a different witness. In any event, McClain subsequently proved unable to answer questions about Joiner's testimony. Nothing in the record supports Judge Martin's determination that the chance to cross-examine McClain served as an adequate remedy for Joiner's unavailability for cross-examination. *See City of Tucson v. Citizens Utilities Water Co.*, 17 Ariz. App. 477, 481 (1972) (rejecting, as "speculative[,]" opinion of expert who provided no "authority" for his opinion and was "at a loss" to explain it on cross-examination).

**¶83** The second reason we reject Appellees' contention that the rehearing cured the prior due process violation is that Judge Martin and the Commission plainly discouraged the parties from developing and presenting evidence at the rehearing by declaring in advance that they would not consider it. As noted above, *see supra* ¶ 38, Judge Martin ruled that the Commission's "adopt[ion of] the site-load COSS in [the Rate Decision] . . . constituted a final order of the Commission" that "may not be collaterally attacked in this rehearing proceeding." The Commission's chair

similarly announced at the Commission's August 2024 public meeting that the site-load COSS had already been "accepted" "during the [initial] rate case proceedings" and so would not be reheard. The restrictions that Judge Martin and the Commission placed on the scope of the rehearing can hardly be squared with the principle that procedural due process is a right, not a favor, and so cannot properly be extended in a grudging or perfunctory manner. *See Mullane*, 339 U.S. at 315 ("[P]rocess which is a mere gesture is not due process."); *see also Springdale Lodging, LLC v. Town of Springdale*, 552 P.3d 222, 232, ¶ 31 (Utah App. 2024) (recognizing that due process "includes the opportunity to present evidence and argument on [the] issue before decision"; "Mere notice is an empty gesture if it is not accompanied by a meaningful chance to make your case." (citations omitted)).

**¶84**        The record shows that the restrictions that the Commission placed on the scope of the rehearing inhibited a full evaluation of the validity of the site-load COSS. The Commission's own expert, Dr. Dismukes, testified that he did no "independent analysis" of the "methodology" of APS's site-load COSS because he believed the subject "was outside the scope of the rehearing." Erdwurm similarly testified that RUCO did not attempt, prior to the rehearing, to determine "whether the [site-load COSS] supports or does not support" the imposition of solar-specific charges because Judge Martin "conclu[ded]" in July 2024 that the site-load COSS's "findings are final." Vote Solar's Bowman, too, testified during the rehearing that she did not submit any specific proposals to modify the site-load COSS because she believed it to be outside the scope of the rehearing.

**¶85**        At oral argument, counsel for APS maintained that the restrictions that Judge Martin and the Commission placed on the scope of the rehearing could not have discouraged Appellants from gathering and presenting evidence to undermine the validity of APS's site-load COSS. APS's counsel stated that Judge Martin's ruling "limit[ing] the scope of the rehearing" "happened after everyone had submitted their pre-filed written testimony." "Before that ruling happened," counsel maintained, "Appellants had already filed all of their experts' pre-filed written testimony." Counsel specifically disputed Bowman's testimony that the restrictions on the scope of the rehearing deterred her from proposing modifications to the site-load COSS. According to counsel, before Judge Martin issued her July 2024 ruling limiting the scope of the rehearing, Bowman "had already filed written testimony that made whatever argument she was going to make." APS's counsel asserted, in other words, that by the time the Commission declared the site-load COSS off limits,

Appellants had already gathered and presented all of the evidence they wanted to present to challenge the validity of the site-load COSS.

¶86 The record refutes counsel's assertions about the timing of the relevant events. Judge Martin's August 2024 procedural order directed the parties to submit pre-filed written testimony by September 24, 2024. By the time Judge Martin issued this order, she had already issued her July 2024 ruling limiting the scope of the rehearing, and the Commission's chair had made a statement of similar import at a public meeting. Counsel's challenge to the accuracy of Bowman's testimony is thus not borne out by the record.

¶87 Admittedly, in the same July 2024 order in which she ruled the site-load COSS "may not be collaterally attacked in this rehearing proceeding[,]" Judge Martin also found it "reasonable to allow the parties to address the site-load COSS and its relationship to and impact on the GAC[.]" Judge Martin thus left the scope of the evidentiary proceedings ambiguous. This ambiguity in itself violated due process; due process does not allow an adjudicator to leave the parties guessing about the issues that will be addressed. *Lankford v. Idaho*, 500 U.S. 110, 126 n.22 (1991) ("In a variety of contexts, our cases have repeatedly emphasized the importance of giving the parties sufficient notice to enable them to identify the issues on which a decision may turn.") (citing cases); *see also Carlson v. Ariz. State Personnel Bd.*, 214 Ariz. 426, 432-33, ¶ 22 (App. 2007) (holding that personnel board violated terminated employee's due process rights by upholding termination on ground not alleged in termination notice).

¶88 Appellees argue that even if the Commission's pre-hearing orders deterred interested parties from preparing evidentiary challenges to the site-load COSS, Appellees are entitled to no relief because they failed to make an offer of proof about what such a challenge would have shown.

¶89 Arizona Rule of Evidence ("Rule") 103(a) provides that a party "may claim error in a ruling to . . . exclude evidence" only if, *inter alia*, the party "informs the court of [the] substance" of the evidence "by an offer of proof, unless the substance was apparent from the context." Ariz. R. Evid. 103(a)(2). Pursuant to this rule, appellate courts have generally refused to consider challenges to the preclusion of evidence at trial unless the proponent made a timely offer of proof. *See Warfel v. Cheney*, 157 Ariz. 424, 431 (App. 1988) ("An offer of proof . . . is a prerequisite to an appellate argument of admissibility of excluded evidence."); *see also State v. Hernandez*, 232 Ariz. 313, 321, ¶ 37 (2013) (rejecting defendant's challenge to trial court's "refus[al] to permit him to impeach" witness with prior inconsistent statements because defendant failed to make an offer of proof;

"The lack of an offer of proof forecloses [defendant's] argument on appeal."). But Appellees cite no case holding that Rule 103(a) applies in rate cases. Since the Rules of Evidence are not strictly applied in Commission proceedings, we question Rule 103(a)'s applicability here. *See* A.A.C. R14-3-109(K) ("In conducting any investigation, inquiry or hearing, neither the Commission nor any officer or employee thereof shall be bound by the technical rules of evidence[.]"; "Rules of evidence . . . will be generally followed but may be relaxed in the discretion of the Commission or presiding officer when deviation from the technical rules of evidence will aid in ascertaining the facts.").

**¶90**        Assuming, without deciding, that Rule 103(a) applies in rate cases, Appellees' argument overlooks Rule 103(b), the companion rule which provides that an offer of proof is not necessary "to preserve a claim of error for appeal" if "the court rules definitively on the record . . . before . . . trial[.]" Ariz. R. Evid. 103(b). When a trial court issues a pretrial ruling precluding a line of inquiry, a litigant need not make an offer of proof at trial to preserve its challenge to the ruling for appeal. *Molloy v. Molloy*, 158 Ariz. 64, 68 (App. 1988) (noting that an offer of proof may not be necessary "when the court has ruled broadly that no evidence is admissible in support of the theory or fact sought to be established[.]" (citation modified)).

**¶91**        *Molloy* is directly on point. In *Molloy*, the wife in a dissolution case sought a pretrial award of community funds to pay for an expert appraisal of the husband's law practice. The husband opposed her request, asserting that an expert appraisal was neither necessary nor appropriate because the value of his firm "was conclusively established by" stock redemption and other agreements among the firm's shareholders. *Id.* at 65. After the trial court denied the wife's request, she presented no expert testimony of the firm's value at trial. *Id.* On appeal, the wife challenged the court's denial of her request for funds for an expert appraisal. In response, the husband argued that "even if the trial court erred in prohibiting [the wife] from presenting independent expert evidence concerning the value of his practice," the wife failed to preserve her claim for appeal "because she made no offer of proof of what [the expert's] testimony would have been." *Id.* at 68.

**¶92**        Rejecting the husband's claim that the wife's failure to make an offer of proof doomed her claim on appeal, the *Molloy* court noted that the husband had "successfully argued to the trial court" that an expert appraisal would be inadmissible because his firm's value was conclusively established by the shareholder agreements. *Id.* Because he persuaded the

trial court, before trial, that her proposed expert appraisal would be inadmissible, the *Molloy* court found "singularly unpersuasive" his contention on appeal that she was barred from challenging the trial court's ruling because she did not obtain an expert appraisal anyway and "present[] it by offer of proof." *Id.* Reversing the judgment, the Court held that the trial court "denied [the wife] a fair trial on the question of the value of [the husband's] practice by denying her the chance to contest" his evidence of the firm's value "with a differing evaluation of her own." *Id.*

¶93 Here, the parties disputed, before the rehearing's evidentiary proceedings began, whether the validity of the site-load COSS was within the scope of the rehearing. APS argued that it was not, and Judge Martin agreed. The Commission's chair made a statement to the same effect at a public meeting of the Commission. Because the Commission made clear, before the evidentiary proceedings began, that it would not entertain evidentiary challenges to the site-load COSS, we find Appellees' efforts to fault Appellants for failing to gather such evidence anyway so they could present it by offer of proof to be "singularly unpersuasive[,]" *see Molloy*, 158 Ariz. at 68.

¶94 Appellees' assertion that we must defer to the Commission's determination that the evidence and argument Appellants presented at the rehearing did not justify "upset[ting]" the Rate Decision is likewise unpersuasive. The Commission's decision to affirm the Rate Decision was based on the premise that the Rate Decision was presumptively valid and Appellants bore the burden to establish otherwise. This premise was incorrect. As AriSEIA correctly argues, "[t]he utility, not the intervenor, bears the burden of demonstrating that a rate is just, reasonable, and supported by substantial evidence."

¶95 As a general rule, the party seeking modification of a judicial or administrative decision bears the burden of justifying that request. *See*, *e.g.*, A.R.S. § 40-254(E); A.A.C. R14-3-109(G); *Grand Canyon Trust v. Ariz. Corp. Comm'n*, 210 Ariz. 30, 33, ¶¶ 9-10 (App. 2005) (noting that "the party adverse to the commission" bears the burden of proof in proceedings brought in superior court under Section 40-254); *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) ("The burdens of pleading and proof with regard to most facts have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion[,]" (quoting 2 J. Strong, McCormick on Evidence § 337 at 412 (5th ed. 1999))).

**¶96** This rule does not apply, however, when a rehearing is ordered because the disputed decision was rendered in violation of due process. A judgment or administrative decision issued in violation of due process is void. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270-71 (2010) (observing that a judgment may be "void" if "premised . . . on a violation of due process that deprives a party of notice or the opportunity to be heard." (citation omitted)); *see also Gibbons*, 95 Ariz. at 346-47 (holding "void" order entered by Commission "without giving proper and legal notice to petitioners as interested parties"). A determination that a judgment or decision is void deprives it of all force and effect. *Smith v. Smith*, 235 Ariz. 181, 184, ¶ 12 (App. 2014) ("[A] void decree is a nullity," and "all proceedings founded on the void decree are themselves regarded as invalid[.]" (citation modified)). Because the initial proceedings that culminated in the Rate Decision's approval of the GAC and the legacy adjustment did not comport with due process, we agree with AriSEIA that the provisions of the Rate Decision adopting the site-load COSS and authorizing the solar-specific charges were "void from inception."

**¶97** The Commission could not properly accord a presumption of validity to those void provisions of the Rate Decision during the rehearing proceedings. *Cf. Horne v. Polk*, 242 Ariz. 226, 230, ¶ 14 (2017) (noting that when an agency decision is rendered in violation of due process, the "due process violation is magnified where the agency's final determination is subject only to deferential review."). The Commission could not, in other words, treat the void provisions as valid and shift the burden to Appellants to justify setting those provisions aside. *See Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (holding that due process violation resulting from lack of notice to father before issuance of decree authorizing another to adopt his child was not cured by subsequent rehearing, because father bore burden at rehearing to disprove grounds for the adoption; due process violation could have been cured "only by granting [father's] motion to set aside the decree and consider[ing] the case anew"). Instead, because the Rate Decision's provisions relating to the solar-specific charges were adopted in violation of due process, the rehearing on the validity of those charges should have been conducted as, in effect, a new rate case in which APS, as the party seeking the rate increase, bore the burden to justify the charges. *See* A.A.C. R14-3-109(G) (providing that applicants bear the burden of proof); *see also Palicka v. Ruth Fisher Sch. Dist. No. 90 of Maricopa Cnty.*, 13 Ariz. App. 5, 9 (1970) ("It is the general rule that the party asserting the affirmative of an issue has the burden of proving it.").

**¶98** Even if we were to indulge the counterfactual assumption that the rehearing proceedings gave Appellants a full and fair opportunity

to contest the solar-specific charges and the site-load COSS on which those charges were based, we could not affirm the Rehearing Decision's reaffirmation of the disputed provisions of the Rate Decision because the Rehearing Decision is based on a misallocation of the burden of proof. In the Rehearing Decision, the Commission found that Appellants had not justified modifying the disputed provisions of the Rate Decision because the evidence they presented was "no more reliable than" the evidence presented by APS. In effect, the Commission found that because the evidence for and against the solar-specific charges was evenly balanced, the disputed provisions of the Rate Decision should stand. This was error. As AriSEIA correctly asserts, "APS bore the burden of demonstrating" that the solar-specific charges were "just, reasonable, and supported by substantial evidence." If, as the Commission indicated, the evidence for and against the solar specific charges was evenly balanced, then APS failed, as a matter of law, to meet its burden of justifying the rate increase. After all, "when the scales are evenly balanced[,]" "the party with the burden of proof loses[.]" *Simmons v. Blodgett*, 110 F.3d 39, 40 (9th Cir. 1997); *see also Cellco P'ship v. City of Rochester*, 719 F.Supp.3d 256, 265 (W.D.N.Y. 2024) (same).

**¶99** Because the rehearing did not cure the due process violation that resulted in the Commission's adoption of the solar-specific rate increases in the Rate Decision, we vacate the Rehearing Decision and remand for the Commission to either conduct a due process-compliant rehearing or vacate the provision of the Rate Decision authorizing the imposition of the solar specific charges. And because we set aside the Rehearing Decision on due process grounds, we do not reach Appellants' alternative challenges to it.

## ATTORNEY FEES AND COSTS ON APPEAL

**¶100** Vote Solar, AriSEIA, Banet, and Self request attorney fees under A.R.S. § 12-348 and § 41-1001.01. Section 12-348(A)(2) mandates a fee award to a party "that prevails by an adjudication on the merits in . . . [a] court proceeding to review a state agency decision[,]" while Section 41-1001.01(A)(1) likewise authorizes a fee award only in favor of a party that "prevails . . . against an agency in a court proceeding . . . as provided in § 12-348." These statutes do not apply here, however, because ratemaking decisions are expressly excluded from their scope. A.R.S. § 12-348(H)(1). Appellants are each entitled to taxable costs upon compliance with ARCAP 21. *See* A.R.S. § 12-341.

**CONCLUSION**

¶101 For the foregoing reasons, we vacate the Commission's Rehearing Decision and the provisions of the Rate Decision that adopt the site-load COSS and authorize the imposition of the solar-specific charges (*i.e.*, the GAC and the legacy adjustment) on APS's legacy and non-legacy residential solar customers, and remand for further proceedings consistent with this decision.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:     JR